Jewell Francis **DUNLAP**, Appellee,

v.

G. & C. **TOWING, INC.**, a corporation, Appellant.

No. 78–1571.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 1, 1979.

Decided Jan. 11, 1980.

---

Raymond G. Musgrave, Point Pleasant, W.Va. (Thomas W. Pettit, Vinson, Meek, Rife, Musgrave & Peoples, Huntington, W.Va., on brief), and Stephen W. Graffam (Grogan, Graffam, McGinley & Solomon, Pittsburgh, Pa., on brief), for appellant.

Don C. Kingery, Point Pleasant, W.Va. (C. Dallas Kayser, Kingery & Nibert, Point Pleasant, W.Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, BRYAN, Senior Circuit Judge and MURNAGHAN, Circuit Judge.

MURNAGHAN, Circuit Judge:

Appellant, G. & C. Towing, Inc., operated the motor vessel, *Duncan Bruce* commercially on the Kanawha River. Appellee, Jewell Francis Dunlap, who had served as an engineer responsible for the engine room on the *Duncan Bruce*, brought an action under the Jones Act, 46 U.S.C. § 688, and under the general maritime law, to recover damages as a result of incapacity occasioned by a left inguinal hernia which he suffered while serving as a member of the *Duncan Bruce* crew.

Dunlap initially suffered a hernia as a consequence of activity on board the *Duncan Bruce* in September, 1973. It was surgically repaired, and he returned to work. On March 20, 1975, while Dunlap was serving on the *Duncan Bruce*, the hernia recurred. There were no witnesses of the events which occasioned the recurrence other than Dunlap.

He testified that the engines were located on the lower deck, and extended upward through an upper deck. On the upper deck were points of access to the engines through which oil to lubricate the engines had to be poured periodically. Dunlap went from his usual location on the lower deck to a point on the upper deck where there was stored a 55 gallon oil drum, moved the

drum so as to afford himself access to its contents, and drew off five gallons into a container.

Dunlap then proceeded to a point on the upper deck where he could pour the oil into one of the engines. About to perform the pouring operation, Dunlap slipped, and fell to his left knee, at which time, he testified, he felt pain in the area in which he had previously experienced his hernia. He thereupon observed a swelling which indicated that the hernia had recurred.

There was testimony that the engines of the *Duncan Bruce* were worn with age. The main engine leaked oil onto the lower deck, at the base of the engine, primarily through an inspection plate at a point which had a piece 12 inches long by 2½ inches wide brazed in where previously a blown piston had broken through. Furthermore, because engine linings were worn, according to some testimony, a blow-back phenomenon occurred through the fuel pump, resulting in discharge of a smoke, comprised partly of oil and partly of water. The smoke became a mist, which settled in the form of a film in various places, in particular on the upper deck and upper deck railings.

The testimony about blow-back misting and filming was not uncontradicted, however. Dunlap called the man who had been captain of the *Duncan Bruce* in 1975. He was asked: "What was the problem with the engines with respect to oil?" He answered that they leaked around the pans, i. e. at the lower deck level. Dunlap's counsel then put a leading question, to which an objection was sustained: "Was the engine room usually covered with a film of oil on the upper deck?" Dunlap's counsel did not pursue further with the witness the subject of misting or filming, concentrating on oil leakage, and developing that leaking oil in the manner of the *Duncan Bruce* was a chronic problem with older vessels. Another *Duncan Bruce* crew-member called by the plaintiff attributed the oily condition of the engine room solely to the leaking of oil.

The two factors which were claimed to contribute to a generalized oily or slippery condition in and about the engine room were not, on March 20, 1975, of recent origin. That Dunlap and others were fully aware of their existence was not in dispute. Among Dunlap's assigned responsibilities, during watches he served, was the cleaning up of both lower deck and upper deck areas in and about the engine room, particularly the removal of oil on the various surfaces. The testimony was conflicting as to whether such cleaning up, particularly in the upper deck area with which the case is primarily concerned, would be so time-consuming as to interfere with Dunlap's primary duties as an engineer.

Several witnesses besides the captain testified that the oily conditions customarily to be found on the *Duncan Bruce* were common to other vessels. Some testimony to that effect was confined to oil leaks from the engines. Other testimony, however, while not as explicit as it might be, was susceptible of interpretation by a factfinder as establishing that blow-back misting and resulting filming were also conditions frequently encountered. James Scott McDermott, who also served as an engineer on the *Duncan Bruce*, called by the defendant, was asked: "Now, compared with, if you can recall, your service aboard the *Duncan Bruce* with other vessels that you worked on during that period of time, would you say that that engine room was more oily or less oily than the other vessels?" He answered: "Approximately the same."

The father of that witness was also called by the plaintiff, whose counsel first got the father to describe the blow-back phenomenon, and the resulting filming. Plaintiff's counsel then asked: "Okay. Mr. McDermott, on the vessels that you worked for G. & C. and for other companies, did you have the same problem with the oil on those engines that you had on the *Duncan Bruce*?" The witness replied: "Just about the same." When asked by Dunlap's counsel if the problem were a chronic one, he gave an affirmative response.

There was no direct evidence that any substantial, visible accumulation of oil or grease had developed at the place where

Dunlap slipped. No testimony established that he or another had tracked oil leaking out of the engines on the lower deck to the upper deck. Plaintiff testified that the mist covered the handrailing, adding "You could take your hand and scoop the grease and oil off of them." Significantly, plaintiff did not testify as to any such accumulation on the deck. He claimed his injury resulted when his foot slipped on the deck.

■ The district judge, feeling himself bound by this Court's decision in *Schell v. Chesapeake & Ohio Ry. Co.*, 395 F.2d 676 (4th Cir. 1968), instructed the jury that unseaworthiness, as a matter of law, had been established, because of the oily condition of the deck on which Dunlap had slipped and suffered an injury. Normally, unseaworthiness, where there is a dispute in the testimony or differing inferences can be drawn from the evidence, is a matter for the jury's determination. *E.g., Lundy v. Isthmian Lines, Inc.*, 423 F.2d 913, 915 (4th Cir. 1970); *Venable v. A/S Det Forenede Dampskibsselskab*, 399 F.2d 347, 353 (4th Cir. 1968). The opinion in *Schell* dealt with a situation quite different from the one presented here. There, a tug was docked to effect a steering engine repair requiring the removal of the crank shaft. The plaintiff was instructed to climb a ladder to a platform which surrounded the steering engine. When he did so, the steps of the ladder were clean. On descending the ladder, plaintiff slipped, injuring himself. After the accident the plaintiff observed black grease, about the size of a dollar bill, on the dark metal steps.

The *Schell* opinion emphasized the uncontradicted nature of the testimony. *Cf. Greene v. Vantage Steamship Corporation*, 466 F.2d 159, 162 (4th Cir. 1972). It concerned a spot which appeared as a single event, not as part of a continuous accretion through a process of misting with which the plaintiff was familiar, and which, if some of the testimony were believed, was chronic to vessels like the *Duncan Bruce*. There was even some testimony contradicting plaintiff's theory that a film had formed and made the deck oily at the point he slipped.[1]

■ The issue of unseaworthiness was for the jury in this case, and we, therefore, reverse. *Cf. Rice v. Atlantic Gulf & Pacific Co.*, 484 F.2d 1318, 1321 (2d Cir. 1973), a case involving a claim of unseaworthiness because of an oil film on a ladder from which the plaintiff slipped and fell. In reversing a lower court's determination that the ship owner was entitled to judgment as a matter of law, the Second Circuit stated:

> Our decision must not be construed as a holding that every case where a seaman claims injuries as the result of slipping on oil or grease must as a matter of law be submitted to the jury. In the operation of a ship of the type here involved a certain amount of oily film normally accumulates on decks and stairs. The mere existence of such a film does not necessarily constitute unseaworthiness. A seaman is not entitled to a deck or ladder that is free of all oil or grease. Unseaworthiness exists only when the oil or grease creates such a condition of slipperiness that the deck or stairway is no longer reasonably fit for its intended use by the crew. *Colon v. Trinidad Corporation*, 188 F.Supp. 97 (S.D.N.Y.1960); *Borgersen v. Skibs*, 156 F.Supp. 282 (E.D.N.Y.1957).

In this case it was a jury question, *inter alia*, whether the deck, at the time of Dunlap's injury, was no longer reasonably fit for its intended use.

---

1. These sufficient distinctions of *Schell* make it unnecessary to consider the relevance to the issue of unseaworthiness of the possibility that Dunlap, himself, carrying five gallons of oil in a container, may have spilled some, creating the slick on which he slipped. More generally, as the trial judge correctly charged, it was for the jury to determine the credibility of all witnesses and the weight to accord each witness' testimony. Since Dunlap was the only witness to the March 20, 1975 mishap the jury's liability finding depended heavily upon its assessment of Dunlap's credibility. It is not difficult to see how an erroneous directed verdict on the issue of unseaworthiness may well have foreclosed the jury's plenary consideration of plaintiff's credibility.

The issue remains as to whether, under F.R.C.P. 59, the reversal should be partial, as to the finding of liability, with the damage award left intact, to be revived if, on a partial new trial as to liability, the plaintiff prevails. In the circumstances of this case, we feel it appropriate to order a complete new trial as to damages as well as liability. *See generally, Williams v. Slade,* 431 F.2d 605, 608–09 (5th Cir. 1970); Wright and Miller, *Federal Practice and Procedure:* Civil § 2814 at p. 97.

In reaching this conclusion, we are influenced by the consideration that the district judge gave a very suspect "missing witness" instruction at plaintiff's request. The instruction was sought by plaintiff's counsel and used by him in closing argument to the jury to refute a contention of defendant that the plaintiff's disability was due, not to the hernia, but to a heart condition which preceded or was contemporaneous with the March 20, 1975 hernia. The witness involved was plaintiff's treating physician. He was equally available to either party. That made the instruction inappropriate. *United States v. Kenney,* 500 F.2d 39, 40 (4th Cir. 1974); *Kean v. Commissioner of Internal Revenue,* 469 F.2d 1183, 1187–8 (9th Cir. 1972). Though defendant had, in the pretrial stages, apparently made known its intention to raise the heart condition defense, it was plaintiff's counsel who anticipatorily first introduced the issue by having his client testify that his heart trouble first arose over a year after March 20, 1975.

Defendant's counsel acted in a way which might have rendered the erroneous "missing witness" instruction unavailable as a ground for reversal if the liability issue had been decided by us in plaintiff's favor. Defendant's counsel listed plaintiff's doctor as a witness he planned to call, but then did not subpoena him or otherwise arrange for his presence at trial. However, we need not decide the question of whether defendant's counsel waived the objection to the instruction as an independent ground for reversal. Even if it is not such an independent ground, it suffices to establish that the reversal should be general, extending to the issue of damages as well as to the issue of liability.

REVERSED AND REMANDED FOR A NEW TRIAL IN ACCORDANCE WITH THIS OPINION.