35 F.3d 978
 63 USLW 2211, Fed. Sec. L. Rep. P 98,400,
30 Fed.R.Serv.3d 561,
RICO Bus.Disp.Guide 8656
 Joseph W. TEAGUE; Helen B. Teague; Steven Allen Barker;
Rita Strahowski; Swannee Beck; Karen Perez Tucker,
Lifetime Partners of PTL, as representatives of a nationwide
class consisting of 150,000 PTL Lifetime Partners,
Plaintiffs-Appellants,
v.
James O. BAKKER; David A. Taggart; Aimee Cortese;
Deloitte, Haskins & Sells, Defendants-Appellees,
and
Roe Messner, a/k/a Ronald Messner; Messner Enterprises;
Commercial Builders of Kansas, Inc.; Laventhol &
Horwath; William J. Spears, Defendants.
North Carolina Securities Commission, Amicus Curiae.
Joseph W. TEAGUE; Helen B. Teague; Steven Allen Barker;
Rita Strahowski; Swannee Beck; Karen Perez Tucker,
Lifetime Partners of PTL, as representatives of a nationwide
class consisting of 150,000 PTL Lifetime Partners,
Plaintiffs-Appellees,
v.
David A. TAGGART, Defendant-Appellant,
and
James O. Bakker; Aimee Cortese; Roe Messner, a/k/a Ronald
Messner; Messner Enterprises; Commercial Builders of
Kansas, Inc.; Laventhol & Horwath; William J. Spears;
Deloitte, Haskins & Sells, Defendants.
North Carolina Securities Commission, Amicus Curiae.
Joseph W. TEAGUE; Helen B. Teague; Steven Allen Barker;
Rita Strahowski; Swannee Beck; Karen Perez Tucker,
Lifetime Partners of PTL, as representatives of a nationwide
class consisting of 150,000 PTL Lifetime Partners,
Plaintiffs-Appellees,
v.
DELOITTE, HASKINS & SELLS, Defendant-Appellant,
and
James O. Bakker; David A. Taggart; Aimee Cortese; Roe
Messner, a/k/a Ronald Messner; Messner Enterprises;
Commercial Builders of Kansas, Inc.; Laventhol & Horwath;
William J. Spears, Defendants.
North Carolina Securities Commission, Amicus Curiae.
Joseph W. TEAGUE; Helen B. Teague; Steven Allen Barker;
Rita Strahowski; Swannee Beck; Karen Perez Tucker,
Lifetime Partners of PTL, as representatives of a nationwide
class consisting of 150,000 PTL Lifetime Partners,
Plaintiffs-Appellees,
v.
JAMES O. BAKKER, Defendant-Appellant,
and
David A. Taggart; Aimee Cortese; Roe Messner, a/k/a Ronald
Messner; Messner Enterprises; Commercial Builders of
Kansas, Inc.; Laventhol & Horwath; William J. Spears;
Deloitte, Haskins & Sells, Defendants.
North Carolina Securities Commission, Amicus Curiae.
 Nos. 91-2101, 91-2120 to 91-2122.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 4, 1993.
Decided Sept. 23, 1994.
 
 ARGUED: Wendell R. Bird, Bird & Associates, Atlanta, GA, for appellants. James T. Williams, Jr., Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, NC, Michael Eli Quiat, Uscher, Quiat, Uscher & Strull, Hackensack, NJ, Ben Cotten, Cotten & Selfon, Washington, DC, for appellees. ON BRIEF: David J. Myers, Bird & Associates, Atlanta, GA, Thomas T. Anderson, Samuel F. Trussell, Thomas T. Anderson & Associates, Indio, CA, Jonathan F. Wallas, Ferguson, Stein, Watt, Wallas, Adkins & Gresham, Charlotte, NC, for appellants. Robert A. Singer, Jim W. Phillips, Jr., Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, NC, for appellee Deloitte, Haskins & Sells; Daniel Schumack, Cotten & Selfon, Washington, DC, for appellee Taggart; Nelson M. Casstevens, Jr., Casstevens, Hanner, Gunter & Gordon, P.A., Charlotte, NC, for appellee Cortese; James H. Toms, Hendersonville, NC, for appellee Bakker.
 Before RUSSELL and HALL, Circuit Judges, and CLARKE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 Affirmed in part and reversed and remanded in part by published opinion. Judge DONALD RUSSELL wrote the opinion, in which Judge K.K. HALL and Senior Judge CLARKE joined.
 OPINION
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 The plaintiffs, members of a class of approximately 160,000 individuals who purchased "Lifetime Partnerships" from an entity known as "PTL" entitling them to a short stay annually in a hotel at a vacation retreat constructed by PTL, brought the instant suit against numerous defendants alleging common law fraud, federal and state securities fraud, state timeshare fraud, federal and state RICO violations, and negligence, all in connection with the oversale of PTL Lifetime Partnerships. Plaintiffs proceeded to trial against James O. Bakker ("Bakker"), Deloitte, Haskins & Sells ("DH & S"), Aimee Cortese ("Cortese") and David A. Taggart ("Taggart"). Before the case was sent to the jury, the district court granted defendants' motion for a directed verdict with respect to plaintiffs' securities fraud claims. Following deliberations, the jury found Bakker guilty only of common law fraud. DH & S, Taggart and Cortese were absolved of all liability. The district court entered judgment against Bakker on the common law fraud count for $129,618,000 in compensatory damages and for an additional $129,618,000 in punitive damages.
 
 
 2
 Plaintiffs appeal from the judgments entered against them. Bakker cross-appeals on the ground that the issues of reliance, causation and damages in relation to the adverse fraud verdict should have been handled on an individual class member basis. DH & S and Taggart cross-appeal from the district court's denial of their petition for reimbursement of costs. We reverse the district court's grant of judgment as a matter of law against plaintiffs on their securities fraud claims against Bakker, and otherwise affirm the district court's judgments in all respects.[1]
 
 I.
 A.
 
 3
 PTL, which stands for "Praise the Lord" and "People that Love," consists of various nonprofit entities. Bakker was the founder, president, a director, and the spiritual and financial leader of PTL. DH & S, an international accounting firm, provided PTL with independent auditing services in the early 1980's. DH & S's last audit of PTL was completed by October 24, 1984. In addition, during the time that it provided auditing services and for a time thereafter, DH & S administered PTL's "Executive Payroll Account" upon which checks transmitting salary and benefits to Bakker and other PTL executives were drawn.
 
 
 4
 Cortese was the pastor of a small church in New York City. In 1979, a director of PTL, Reverend Richard Dortch ("Dortch"), approached Cortese about the possibility of Cortese joining PTL's board of directors. In 1980, despite her lack of experience with financial matters, Cortese agreed to serve on PTL's board. She remained a board member until 1987.
 
 
 5
 Taggart held various offices in PTL, including the title of vice-president, but he had few, if any, real management duties. Taggart was primarily Bakker's administrative aide and was not a PTL director.
 
 
 6
 This case concerns primarily PTL's sale of Lifetime Partnerships ("LTPs").[2] We previously affirmed criminal convictions against Bakker arising therefrom. United States v. Bakker, 925 F.2d 728 (4th Cir.1991). At the time, we summarized the relevant underlying facts thus:
 
 
 7
 ... [I]n the late 1970s PTL began construction on "Heritage USA," described by PTL officials as a Christian retreat center for families. In 1983, Bakker announced plans to enlarge the center by adding a vacation park, "Heritage Village," that would include the 500-room Grand Hotel. Between 1984 and 1986, [Bakker] announced further proposals to expand the Village by constructing the Towers Hotel, 50 bunkhouses, and several additional facilities.
 
 
 8
 Bakker planned to finance these projects by selling lifetime partnerships. He offered eleven different partnership programs ranging in cost from $500 to $10,000. Eight of the partnerships promised benefits that included annual lodging in one of the Heritage Village facilities. In January 1984, [Bakker] began using the mail to solicit lifetime partners. Also, from February 1984 through May 1987, Bakker used broadcasts carried on the PTL Television Network and various commercial affiliates to solicit lifetime partners. Many of these partners drew on meager incomes to purchase Heritage Village lodging benefits. [Bakker] raised at least $158 million through the sale of approximately 153,000 partnerships with lodging benefits.
 
 
 9
 Bakker promised television viewers that he would limit the sale of partnerships to ensure that each partner would be able to use the facilities annually. [Bakker], however, oversold the partnerships. He promised, for instance, to limit the sale of Grand Hotel partnerships to 25,000 but actually sold 66,683. In addition, Bakker used relatively few of the funds solicited from the partners to construct promised facilities. In fact, of the proposed Heritage Village facilities, only the Grand Hotel and one bunkhouse were actually completed. Instead, Bakker used partnership funds to pay operating expenses of the PTL and to support a lavish lifestyle.... This combination of overselling partnerships and diverting partnership proceeds meant that the overwhelming majority of the partners never received the lodging benefits Bakker promised them.
 
 925 F.2d at 731-32.[3]
 
 10
 Some additional facts will allow for a more complete understanding of the circumstances involved herein. First, when PTL announced the beginning of the LTP program and the construction of the Heritage Grand Hotel in December of 1983, the program was limited to 25,000 subscribers. As of May 31, 1984, the end of the last fiscal year audited by DH & S, approximately 17,000 LTPs had been purchased. In September of 1984, after DH & S had completed its audit field work, a PTL vice-president informed DH & S that construction of a second hotel, the Heritage Towers, was planned and that the LTP program was to be expanded so as to increase the maximum number of potential subscribers by 30,000 to a total of 55,000. Upon learning of PTL's contemplated expansion of the LTP program, DH & S added a note, dated October 24, 1984, to the financial statement it had prepared for PTL's 1984 fiscal year; this note detailed the PTL's planned expansion of the LTP program.
 
 
 11
 Plaintiffs contend that DH & S was aware of, but failed to disclose, oversales of LTPs. The evidence shows that DH & S checked and knew that, with regard to LTP sales, in April of 1984, "$17,000,000 in pledges has been received of which approximately $9,000,000 has been collected," J.A. 2045, and that, in May of 1984, "$22 million [had been] pledged toward [the] Heritage Grand Hotel," J.A. 1978. By the end of the last fiscal year for which DH & S performed an audit, then, there were no oversales. The evidence also shows that, by August 25, 1984, prior to the completion of DH & S's field audit, LTP payments had grown to $30.7 million, with an additional $15 million more pledged. J.A. 2567. There is no evidence, however, that DH & S was aware of these oversales at the time.
 
 
 12
 During the 1980's, the PTL board awarded Bakker, his wife, Tammy Faye Bakker ("Tammy"), and Dortch numerous sizeable bonuses. For example, in 1984 Bakker received $640,000; in 1985 he received $450,000; in 1986 he received $600,000; and in 1987 Bakker was given $1,167,605. J.A. 2366. Bakker's benefits also were tremendous.[4] The compensation, bonuses and cash benefits paid to Bakker, Tammy and Dortch all came from the Executive Payroll Account managed, through mid-1985, by DH & S.
 
 
 13
 The board overwhelmingly approved the compensation for Bakker, Tammy and Dortch. The only exceptions to unanimous votes were an occasional negative vote or abstention cast by directors who were the direct beneficiaries of the board's action, usually Bakker and Dortch.
 
 
 14
 Although Cortese was a board member, she had little business experience. As a consequence, when issues with respect to which she lacked expertise arose, Cortese consulted with other board members including, in particular, Dortch.
 
 
 15
 During the same period of time in which Bakker, Tammy, and Dortch were receiving large amounts of money from PTL, PTL's vice-president in charge of finance issued repeated warnings of the economic woes which PTL was barely enduring. A January 1984 memorandum informed Bakker that PTL owed $9.3 million on a past due loan and owed a total of $13 million to all creditors. Bakker was admonished to "[c]urtail as much future spending as possible for the next two months ... [because PTL was] not able to make commitments to anyone else." J.A. 1821. A March 1984 memorandum to Dortch stressed the "need to seriously trim our payroll." J.A. 1823. The memorandum continued: "Each day brings us into a deeper crisis." Id. A November 1984 memorandum to Bakker stated: "Until contributions come up to the levels of our current operational expenses, it will continue to be necessary to cover operating expenses from the Tower funds." J.A. 1838. Another memorandum later that month stated succinctly: "We are in a very serious cash flow position." J.A. 1840.
 
 
 16
 A draft of DH & S's audit report for the fiscal year ending May 31, 1984, expressed concern over "whether PTL w[ould] be able to continue as 'a going concern' based on current assets of only [$]8.6 million against [$]28.5 million in current liabilities." J.A. 2046. Such concern, however, was expurgated from the report before its issuance.
 
 
 17
 As indicated by the excerpt, quoted above, from a PTL internal memorandum, to help meet the demands for cash which PTL was experiencing, Bakker diverted funds earmarked for the construction of facilities for the Lifetime Partners to various operating expenses. Yet, despite the dire financial straits in which PTL found itself and the IRS's decision, in late 1983, to audit PTL, Bakker issued to prospective lifetime partners a brochure promoting the LTPs which stated: "You cannot find a better investment opportunity anywhere...." J.A. 2185E. Bakker made similar representations enticing viewers to purchase LTPs on television.
 
 
 18
 As mentioned above, in late 1983, PTL fell prey to an IRS audit which culminated in PTL being stripped of its tax-exempt status. The IRS took this action in part due to private inurement allocated to Bakker and Tammy. The loss of tax exempt status threatened to create huge tax liabilities and to leave PTL unable to attract the deductible contributions which were its lifeblood.
 
 
 19
 A DH & S workpaper prepared in relation to DH & S's 1983 six-month review of PTL states: "IRS exam will find private inurement [and] it'll go to court [and] we'll lose." J.A. 2148. DH & S did, in a note to its 1984 audit report, make reference to the fact that the IRS had commenced its own audit of PTL, although no specific mention was made of the issue of private inurement.
 
 
 20
 Plaintiffs focus their attention on DH & S and allege that the accounting firm aided and abetted Bakker's claimed frauds in several ways. First, as noted above, plaintiffs argue that DH & S was, in fact, aware of the oversale of LTPs. Second, plaintiffs claim that DH & S had knowledge that PTL was having difficulties in maintaining its solvency but concealed this problem from the partners under pressure from PTL. Third, plaintiffs further argue that DH & S must have had knowledge of the diversion of hotel construction funds because it prepared PTL's checks to pay construction costs. Fourth, plaintiffs contend that DH & S deliberately concealed the likelihood that the IRS would make a finding of private inurement and, as a consequence, strip PTL of its tax-exempt status. Last, plaintiffs urge that DH & S must have been aware of the exorbitant benefits being awarded to Bakker and Dortch by virtue of its administration of PTL's "Executive Payroll Account," yet failed to make any disclosure.
 
 
 21
 DH & S and Cortese both contend that Bakker and Dortch actively concealed information from PTL's board regarding possible timeshare or securities violations, private inurement concerns, the instability of PTL's tax exempt status, oversales of partnerships, use of partnership funds to pay Bakker's bonuses, and PTL's path to insolvency.
 
 B.
 
 22
 On November 17, 1987, a class of plaintiffs comprised of approximately 160,000 individuals who had purchased the PTL LTPs filed the instant suit. At trial, plaintiffs pursued claims of common law fraud, fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), fraud in violation of the North Carolina Securities Act, N.C.Gen.Stat. Secs. 78A-1 to 78A-65, fraud in violation of the South Carolina Timeshare Act ("SCTSA"), S.C.Code Ann. Secs. 27-32-10 to 27-32-250, violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Secs. 1961-1968, and of the North Carolina Racketeer Influenced and Corrupt Organizations Act ("NC-RICO"), N.C.Gen.Stat. Secs. 75D-1 to 75D-14, and common law negligence. An extensive jury trial was conducted. Near the close of evidence, the district judge granted a directed verdict on the securities fraud claims on the ground that the LTPs were not "securities." The court then submitted the following issues to the jury: (1) whether Bakker violated federal RICO and NC-RICO; (2) whether Taggart or DH & S aided or abetted Bakker's alleged RICO or NC-RICO violations, or conspired to commit such violations; (3) whether Bakker committed common law fraud, and whether DH & S aided and abetted Bakker's alleged common law fraud or conspired to commit such fraud; (4) whether the partnerships were "timeshares" under the SCTSA and whether Bakker had violated the SCTSA, and whether DH & S had aided and abetted Bakker's alleged violation of SCTSA or conspired to commit such a violation; and (5) whether Taggart or Cortese were grossly negligent.
 
 
 23
 The jury returned a verdict against Bakker on the common law fraud count. With this one exception, it refused to place liability on any defendants for any of the remaining claims. The district court entered judgment accordingly. Plaintiffs filed a motion for a new trial which was denied. See Fed.R.Civ.P. 59. DH & S, Taggart and Cortese each moved to assign costs to plaintiffs pursuant to Federal Rule of Civil Procedure 54(d). Despite the verdict in favor of Taggart and DH & S, the trial judge refused to award attorney's fees to either because he considered it to have been a "relatively close and difficult" case as to their liability. J.A. 1815. He did award Cortese attorney's fees because he found the case brought against her "was neither close nor difficult." J.A. 1816.
 
 
 24
 Plaintiffs appeal, contending that the motion for a new trial was improperly denied because the verdicts handed down by the jury were "against the clear weight of the evidence," e.g., Poynter ex rel. Poynter v. Ratcliff, 874 F.2d 219, 223 (4th Cir.1989), for a wide variety of reasons. They also assert that the district court's jury instructions were riddled with errors requiring reversal. Plaintiffs challenge as well the appropriateness of the district court's grant of a directed verdict on the securities fraud claims and several evidentiary rulings. Bakker has filed a cross-appeal in which he contends that the district court erred in failing to resolve the issues of reliance, causation and damages on an individual class member basis. Taggart and DH & S have filed a cross-appeal challenging the denial of their motions for costs against the plaintiff class.
 
 II.
 
 25
 Plaintiffs raise a plethora of assignments of error with respect to the various counts they have brought against the defendants.[5] In order to facilitate our discussion, we briefly summarize the standards of review applicable to plaintiffs' assignments of error. We review de novo the district court's grant of a motion, pursuant to Federal Rule of Civil Procedure 50, for a directed verdict. Gairola v. Virginia Dep't of Gen'l Servs., 753 F.2d 1281, 1285 (4th Cir.1985). We review the denial of a motion for a new trial pursuant to Federal Rule of Civil Procedure 59 solely for abuse of discretion. Poynter ex rel. Poynter, 874 F.2d at 223. In reviewing the adequacy of the district court's choice of jury instructions, we accord the district court much discretion and will not reverse provided that the instructions, taken as a whole, adequately state the controlling law. Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1164 (4th Cir.1986).
 
 III.
 
 26
 We consider first the district court's grant of a directed verdict against plaintiffs as to their securities fraud claim. Plaintiffs urge that the LTPs constituted "securities" within the meaning of the securities acts, and that, as a consequence, the use of fraud in the sale of the LTPs contravened Section 10(b) of the federal Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. Sec. 240.10b-5, as well as the antifraud provision of the North Carolina Securities Act, N.C.Gen.Stat. Sec. 78A-8.
 
 
 27
 The district court explained its reasons for granting defendants' motion for a directed verdict thus:
 
 
 28
 In United Housing Foundation v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the United States Supreme Court held that "when a purchaser is motivated by a desire to use or consume the item purchased ... the securities laws do not apply." Id. at 852-53 [95 S.Ct. at 2060-61] (footnote and citation omitted). Under Forman, the lifetime partnerships at issue in this case are not securities as a matter of law.
 
 
 29
 J.A. 1799. The district court cited no facts in support of its conclusion.
 
 
 30
 "Security," for purposes of federal securities regulation, is defined in Section 2(1) of the Securities Act of 1933, 15 U.S.C. Sec. 77b(1), and in Section 3(10) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78c(10).[6] Among the several definitions provided in both sections, securities are defined to encompass "investment contracts." Plaintiffs allege that the LTPs constitute "investment contracts."
 
 
 31
 The determination of whether a placement of money constitutes an "investment contract" calls for examining the facts under the test enunciated in SEC v. W.J. Howey Co., 328 U.S. 293, 298-99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). The Howey test instructs that an investment contract exists where there has been (i) an investment of money (ii) in a common enterprise (iii) with an expectation of profits garnered "solely" from the efforts of others.[7] At issue here is whether the third prong, that plaintiffs made their investment with an expectation of profits solely from the efforts of others, is met.[8]
 
 
 32
 The Supreme Court considered Howey's third prong in the context of an offering of interests in real estate in United Housing Foundation v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). There the Court was faced with the question of "whether shares of stock entitling a purchaser to lease an apartment in ... a state subsidized and supervised nonprofit housing cooperative ... are 'securities'." Id. at 840, 95 S.Ct. at 2054. The Court answered this question in the negative, explaining:
 
 
 33
 The touchstone [of the Howey test] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment ... or a participation in earnings resulting from the use of investors' funds.... In such cases the investor is "attracted solely by the prospects of a return" on his investment. Howey, supra, [328 U.S.] at 300 [66 S.Ct. at 1103]. By contrast, when a purchaser is motivated by a desire to use or consume the item purchased--"to occupy the land or to develop it themselves," as the Howey Court put it, ibid.--the securities laws do not apply.
 
 
 34
 Id. 421 U.S. at 852-53, 95 S.Ct. at 2060-61 (citations and footnotes omitted). The Court concluded: "In the present case there can be no doubt that investors were attracted solely by the prospect of acquiring a place to live, and not by financial returns on their investments." Id. at 853, 95 S.Ct. at 2061. Reasoned the Court:
 
 
 35
 Nowhere does the [Investment Bulletin circulated to prospective purchasers] seek to attract investors by the prospect of profits resulting from the efforts of the promoters or third parties. On the contrary, the Bulletin repeatedly emphasizes the "nonprofit" nature of the endeavor. It explains that if rental charges exceed expenses the difference will be returned as a rebate, not invested for profit. It also informs purchasers that they will be unable to resell their apartments at a profit since the apartment must first be offered back to [the corporation owning the complex] "at the price ... paid for it." [App. 163a.] In short, neither of the kinds of profits traditionally associated with securities was offered to respondents.
 
 
 36
 421 U.S. at 854, 95 S.Ct. at 2061.
 
 
 37
 Forman, we think, makes clear that, for Howey's third prong to be satisfied, it must be shown (1) that the opportunity provided to offerees tended to induce purchases by emphasizing the possibility of profits, (2) that the profits are offered in the form of capital appreciation or participation in earnings within the meaning of Howey and Forman, and (3) that the profits offered would be garnered from the efforts of others. We turn, then, to an examination of the facts of this case in light of the third prong of the Howey test.[9] We note initially that the third element delineated above, that is, that the profits offered are garnered from the efforts of others, is not at issue here, i.e., appellees do not dispute that, if there are profits here within the meaning of Howey and Forman and if offerees would reasonably have been induced to purchase LTPs based upon promises of profit, Howey's third prong is met. We therefore need only consider the first two elements delineated above.
 
 
 38
 We first observe that the promotional materials circulated by PTL represented that the value of the privileges lifetime partners would receive far exceeded the $1,000 LTP purchase price. We note, in particular, that letters signed by Bakker, promoting the LTPs, state: "You cannot find a better investment opportunity anywhere--you can actually save thousands of dollars during your lifetime with your one-time investment of $1,000 in the ministry of PTL." J.A. 2178. Further, a brochure designed to promote certain LTPs states:There has never been a better value for your investment in the ministry of PTL. For a one-time gift of $1,000 you will be able to stay free for 4 days and 3 nights, every year, for the rest of your life, in the Heritage Grand Hotel!
 
 
 39
 Think of the thousands of dollars you will save during your lifetime!
 
 
 40
 According to the current rate of inflation, if you use your PTL Lifetime Partner membership for 40 years, the gift value of your room at the Heritage Grand Hotel could be worth almost $20,000! You will not be able to find a better investment opportunity anywhere!
 
 
 41
 J.A. 2185E (footnote omitted[10]). Later in the same brochure, it is cautioned: "A maximum of 50% of Heritage Grand Hotel rooms will be available at any given time for Lifetime Partners, allowing for proper hotel maintenance and operations." J.A. 2185H. Other brochures contain similar representations, and Bakker made similar representations on his television program.[11]
 
 
 42
 These promotional materials can be read to suggest that LTP purchasers would receive an economic benefit in the form of discounted lodging privileges at Heritage USA facilities. It can be concluded, moreover, that PTL could offer this benefit by virtue of its operation, at regular prices, of the facilities not occupied by lifetime partners. This conclusion is supported by the fact that at least 50% of such facilities were reserved for regular patrons in order that "proper hotel maintenance and operations" might be maintained.
 
 
 43
 Appellees urge that members of the plaintiff class who testified at trial indicated that, despite the foregoing statements in the materials promoting the LTPs, they purchased LTPs with personal use, not profit, as the central motivation. However, even granting appellees' characterization of the testimony of these witnesses, such testimony simply cannot be dispositive in the face of evidence that the promoter of the scheme in question marketed the scheme by emphasizing the potential for profit. Indeed, the Court in Forman focused not on the testimony of purchasers of cooperative apartments, but on whether the marketing approach adopted by the sellers was likely to induce purchasers interested in turning a profit.[12] 421 U.S. at 853-58, 95 S.Ct. at 2061-63; see Rice v. Branigar Org., Inc., 922 F.2d 788, 790 (11th Cir.1991)[13] ("In addition to looking at the motivations of the purchasers, the Supreme Court also has looked to the emphasis provided in the promotional material to determine whether the sale of something is a sale of 'securities' for the purpose of federal securities law."); Aldrich v. McCulloch Properties, Inc., 627 F.2d 1036, 1039-40 (10th Cir.1980) ("Promotional materials, merchandising approaches, oral assurances and contractual agreements were considered in testing the nature of the product in virtually every relevant investment contract case."). In short, "[i]n the present case," we can and do doubt whether "investors were attracted solely by the prospect of acquiring a [hotel room to use], and not by financial returns on their investments." Forman, 421 U.S. at 853, 95 S.Ct. at 2061.
 
 
 44
 We conclude, then, that the promotional materials used to market the LTPs can be seen as emphasizing the profit potential of the LTPs. The materials not only speak generally of the LTPs as "investment[s]," but also offer specific calculations of the true value of the LTPs as compared to their purchase price. The materials also allow the reader to infer that the value of the LTPs was enhanced by virtue of the commercial activities of the PTL facilities in catering to patrons paying full price. Moreover, it is clear and, as noted above, undisputed, that this benefit arises from the managerial efforts of others.
 
 
 45
 For Howey's third prong to be satisfied, the benefit available to lifetime partners must arise either as capital appreciation or as participation in earnings. We believe that the record before us allows for the conclusion that the benefit in this case arises as capital appreciation. Under the LTP scheme, it seems that the value of the rights to use the various Heritage, USA, facilities would be enhanced, and therefore capital appreciation might accrue, by virtue of the regular commercial operations of half of all the facilities reserved by regular patrons paying full price for their accommodations.
 
 
 46
 Appellees argue that the LTPs are nontransferable and that, as a consequence, lifetime partners could never realize any capital appreciation that the LTPs might accrue. On the record before us, however, we cannot conclude that the LTPs are nontransferable. Appellees first note that several class members testified that they were unaware that LTPs could be transferred or believed that they could not be. As discussed below, however, testimony as to the beliefs of actual purchasers, even if accurately characterized, is not dispositive. Appellees further note that several of the LTPs offering brochures explicitly prohibit transfer of LTPs. See, e.g., J.A. 2185H. Plaintiffs, however, submit evidence indicating the contrary. First, forms, purportedly prepared by PTL, which allow for the transfer of LTP benefits on a yearly basis, J.A. 2626, and a letter from PTL to certain LTP holders indicating that their LTPs were in fact transferable, again on a yearly basis, J.A. 2629. Last, PTL records tabulate the number of LTPs "transferred." See J.A. 2562-72. A jury might reasonably conclude that this and other references to the increasing value of the LTPs might lead partners to infer that they had a right to transfer their LTPs. In short, we cannot say with certainty that a jury would necessarily conclude, on the evidence presented, that the LTPs were not transferable. As a consequence, we cannot rule out the possibility that the LTPs offered purchasers the possibility of realizing capital appreciation. See Forman, 421 U.S. at 854-55, 95 S.Ct. at 2061-62.
 
 
 47
 Thus, the LTPs cannot be excluded from securities law coverage as a matter of law. This conclusion is buttressed by a 1973 SEC interpretive release, Offers and Sales of Condominiums or Units in a Real Estate Development, Securities Act Release No. 5347, 1 Fed.Sec.L.Rep. (CCH) p 1049 (Jan. 4, 1973) (listed at 17 C.F.R. Pt. 231, Int.Rel. No. 5347) (acknowledged by the Supreme Court in Forman, 421 U.S. at 853 n. 17, 95 S.Ct. at 2061 n. 17). The release describes conditions under which offerings of resort condominiums in conjunction with rental arrangements, pursuant to which the condominiums are to be occupied by the owners for part of the year but rented out most of the year, will constitute an offering of securities. The release, after analyzing relevant precedent, concludes:
 
 
 48
 [T]he offering of condominium units in conjunction with any one of the following will cause the offering to be viewed as an offering of securities in the form of investment contracts:
 
 
 49
 1. The condominiums, with any rental arrangement or other similar service, are offered and sold with emphasis on economic benefits to the purchaser to be derived from the managerial efforts of the promoter, or a third party designated or arranged for by the promoter, from rental of the units.
 
 
 50
 2. The offering of participation in a rental pool arrangement; and
 
 
 51
 3. The offering of a rental or similar arrangement whereby the purchaser must hold his unit available for rental for any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit.
 
 
 52
 1 Fed.Sec.L.Rep. (CCH) p 1049, at 2072. The release contemplates that it would apply "to offerings of all types of units in real estate developments which have characteristics similar to those described herein." Id., at 2071. The reasoning and conclusions set forth in the SEC release seem applicable to offerings of timeshares.[14] Indeed, one leading securities law treatise concludes that "[e]ssentially the same analysis applicable to resort condominiums should apply to timesharing ... offerings." II Louis Loss & Joel Seligman, Securities Regulation 970 (1989).
 
 
 53
 The release's third-numbered paragraph, quoted above, seems applicable in the instant case. The LTPs were offered subject to material restrictions as to partners' rights to occupy the various Heritage, USA resorts. In particular, partners were limited with respect to the amount of time each year that they could make use of the various resorts, and their rights to visit the resorts were conditioned upon the requirement that 50% of the resorts remain available for ordinary patrons who were not LTP holders. In effect, partners were required to hold their "interest" in the resorts available for rent during the majority of the year that they did not make use of the resorts.
 
 
 54
 Thus, we cannot conclude, on the record before us, that the LTPs are not securities. Such a determination is properly made by a jury. See Zolfaghari v. Sheikholeslami, 943 F.2d 451, 456 (4th Cir.1991). We therefore conclude that the district court erred in granting appellees' motion for a directed verdict on plaintiffs' federal securities fraud claim against Bakker. We reach a similar conclusion with respect to plaintiffs' state securities fraud claim against Bakker. See N.C.Gen.Stat. Sec. 78A-2(11) (defining "[s]ecurity" to include "investment contract").
 
 
 55
 Despite our conclusion that a jury question exists as to whether the LTPs constituted "securities," however, we must affirm the district court's dismissal of plaintiffs' claim that DH & S aided and abetted Bakker's alleged federal securities fraud violation. In its recent opinion in Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A., --- U.S. ----, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held that Section 10(b) does not support claims for aiding and abetting. On this basis, then, we affirm the district court's judgment as to this count.
 
 
 56
 Remaining for our review is the district court's dismissal of plaintiffs' claim that DH & S aided and abetted Bakker's alleged North Carolina violation of N.C.Gen.Stat. 78A-8. In resolving this question of state law such as this, we must, in the absence of definitive authority from North Carolina's highest court, attempt to divine what that court would do were it faced with this question. See Roe v. Doe, 28 F.3d 404, 406-07 (4th Cir. 1994). We would note that the Supreme Court of North Carolina has stated, in a case raising the issue of whether the in pari delicto defense applied to insider trading actions brought under the North Carolina securities law, that it "pay[s] great deference ... to decisions of the Supreme Court of the United States when they address issues similar to those before us in a given case." Skinner v. E.F. Hutton & Co., 314 N.C. 267, 333 S.E.2d 236, 239 (1985).[15] This suggests that, with regard to the issue now under discussion, the Supreme Court of North Carolina would follow the Supreme Court's holding in Central Bank of Denver, N. A. and conclude that the North Carolina anti-fraud provision does not support a cause of action for aiding and abetting a substantive violation thereof.
 
 
 57
 The issue proves more complicated than that, however. Examination of the language and form of the controlling North Carolina statute, N.C. Gen.Stat. Sec. 78A-8, reveals that the statute "closely parallels the S.E.C. Rule 10b-5."[16] Skinner v. E.F. Hutton & Co., 70 N.C.App. 517, 320 S.E.2d 424, 427 (1984), aff'd in part and rev'd in part, 314 N.C. 267, 333 S.E.2d 236 (1985). We must assume that the North Carolina legislature consciously chose to model its anti-fraud provision on an SEC rule and not on the underlying federal statute. This assumption casts doubt upon whether the Supreme Court's holding in Central Bank of Denver, N. A., based as it was upon an interpretation of Section 10(b) and not Rule 10b-5, should dictate that North Carolina law similarly does not recognize a cause of action for aiding and abetting a fraud in violation of state securities law.[17]
 
 
 58
 We nevertheless find the United States Supreme Court's opinion in Central Bank of Denver, N. A. persuasive as to the North Carolina state law question. Included in the opinion, as an independent ground for the Supreme Court's holding, is the following:
 
 
 59
 Our reasoning is confirmed by the fact that respondents' argument would impose 10b-5 aiding and abetting liability when at least one element critical for recovery under 10b-5 is absent: reliance. A plaintiff must show reliance on the defendant's misstatement or omission to recover under 10b5. Basic Inc. v. Levinson, [485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988) ]. Were we to allow the aiding and abetting action proposed in this case, the defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions. See also [Chiarella v. United States, 445 U.S. 222, 228, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980) ] (omission actionable only where duty to disclose arises from specific relationship between two parties). Allowing plaintiffs to circumvent the reliance requirement would disregard the careful limits on 10b-5 recovery mandated by our earlier cases.
 
 
 60
 --- U.S. at ---- - ----, 114 S.Ct. at 1449-50. Under the North Carolina Supreme Court's opinion in Skinner, this reasoning, grounded upon Rule 10b-5, is equally applicable to plaintiffs' claim against DH & S brought under Section 78A-8.[18]
 
 
 61
 In summary, we reinstate plaintiffs' securities fraud claims under federal and state law against Bakker, but we affirm the dismissal of plaintiffs' federal and state securities fraud claims against DH & S.
 
 IV.
 
 62
 The jury rejected plaintiffs' claim of timeshare fraud under the SCTSA. The district court denied plaintiffs' motion for a new trial, from which denial plaintiffs appeal. Because we conclude that the LTPs at issue in this case are not "vacation time sharing plan[s]" subject to regulation under the SCTSA, we affirm the district court's denial of plaintiffs' motion in this regard.
 
 
 63
 The SCTSA proscribes fraud in connection with the sale of "vacation time sharing plans." S.C.Code Ann. Sec. 27-32-110; see generally Michelle D. Brodie, Note, Regulation of Time Sharing in South Carolina, 37 S.C. L.Rev. 527 (1986). The phrase "vacation time sharing plan" is elucidated by statutory definitional provisions. First, " '[v]acation time sharing plan' means either a vacation time sharing ownership plan or a vacation time sharing lease plan." S.C.Code Ann. Sec. 27-32-10(10). Pertinent here,"[v]acation time sharing lease plan" means any arrangement, plan or similar devise, whether by membership agreement, lease, rental agreement, license, use agreement, security or other means, whereby the purchaser receives a right to use accommodations or facilities, or both, but does not receive an undivided fee simple interest in the property, for a specific period of time during any given year, but not necessarily for consecutive years, and which extends for a period of more than one year....
 
 Id. Sec. 27-32-10(9) (emphasis added).[19]
 
 64
 We believe it crucial that the definition of "vacation time sharing lease plan" is restricted to those plans "which extend[ ] for a period of more than one year." This represents a conscious choice by South Carolina's legislature not to regulate, at least under the SCTSA, those timeshare plans which are of less than one year's duration.
 
 
 65
 The LTPs at issue in this case, by contrast, are the timeshare counterparts of life estates. See Brodie, supra, at 530-38 (describing the SCTSA as distinguishing between timeshare interests based upon their categorization in terms of traditional fee and nonfee interests in real property). A life estate, of course, may well extend beyond one year's duration. Importantly, however, a life estate may also terminate within one year of its creation. We believe that, just as a contract which persists for the duration of a person's life consequently does not satisfy the Statute of Frauds' requirement that all contracts not to be performed within one year of the contract's making be in writing, see S.C.Code Ann. Sec. 32-3-10(5) (requiring that any "action ... brought ... [t]o charge any person upon any agreement that is not to be performed within the space of one year from the making thereof" be in writing),[20] a life estate timeshare interest cannot satisfy the statutory requirement that the timeshare plan "extend[ ] for a period of more than one year." The state legislature has not chosen to extend timeshare fraud protection beyond terms of years to life estates, and it is not for us to second-guess that choice.
 
 
 66
 We conclude that the LTPs sold by PTL are not "vacation time sharing plans" as a matter of law and, on that basis, affirm the judgment entered against the plaintiff class on their timeshare fraud claims.[21]V.
 
 
 67
 Plaintiffs allege that the district court erred in denying their motion for a new trial with respect to their claim against DH & S for aiding and abetting, and conspiring in, Bakker's common law fraud. We conclude, however, that the district court did not abuse its discretion in denying this motion. While the record contains evidence which supports plaintiffs' various theories of aiding and abetting liability on the part of DH & S, we cannot say that the district court abused its discretion in concluding that the jury's verdict was neither against the clear weight of the evidence nor manifestly unjust. See Poynter ex rel. Poynter, supra, 874 F.2d at 223. Appellants, in effect, ask us to retry issues already heard and ruled upon by a jury. This we will not do. It is indeed a rare case where we will second-guess both the jury and the district court in this regard. Nothing in the case now before us warrants such action here.[22]
 
 VI.
 
 68
 We turn next to the plaintiff class's RICO and NC-RICO claims. The jury heard the evidence presented and ruled against the class on each of these claims. The district court denied plaintiffs' motion for a new trial, from which denial they now appeal.
 
 
 69
 As stated above, we review the district court's denial of a motion for a new trial solely for abuse of discretion. We have little trouble concluding that the district court was well within its authority in ruling as it did in the case at bar.[23]VII.
 
 
 70
 The plaintiff class objects to the district court's instruction to the jury that, in order to find Taggart and Cortese liable, it had to find that they had acted with gross negligence. Plaintiffs claim that, under North Carolina law, directors of a corporation are liable to persons who deal with that corporation for ordinary negligence where such negligence contributes to losses.
 
 
 71
 We disagree. In Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 323 N.C. 559, 374 S.E.2d 385, 394 (1988), the Supreme Court of North Carolina held that a portion of a trial court's jury instruction
 
 
 72
 was erroneous because it suggested to the jury that directors and managing officers are chargeable with an omniscient knowledge of the company's affairs and are liable for damages to third parties resulting from simple negligence. This is not the law in North Carolina. See Minnis v. Sharpe, [202 N.C. 300, 162 S.E. 606, rev'd on other grounds, 203 N.C. 110, 164 S.E. 625 (1932) ].
 
 
 73
 While plaintiffs attempt to distinguish Myers & Chapman, Inc. from the case at bar, we think the holding of that case clearly controls here and reject plaintiffs' attempt to avoid its impact. We therefore find no error in the district court's jury instruction. We also reject plaintiffs' contention that the district court abused its discretion in denying their motion for a new trial on these counts.
 
 VIII.
 
 74
 Bakker cross-appeals from the district court's entry of judgment against him on the common law fraud claim, arguing that the district court erred in not resolving the issues of reliance, causation and damages on an individual and not a classwide basis.[24] Given the facts and circumstances surrounding the LTP scheme and the means according to which the fraud found by the jury was perpetrated, we reject Bakker's contention.
 
 IX.
 
 75
 Taggart and DH & S appeal the denial by the district court of their motion for a grant of costs against the plaintiff class. Prevailing parties are entitled to move for an award of costs pursuant to Federal Rule of Civil Procedure 54(d)(1),[25] which provides, in pertinent part: "Except when express provision therefor is made either in a statute of the United States or in these rules, costs ... shall be allowed as of course to the prevailing party unless the court otherwise directs...." The rule makes clear that, in the ordinary course, a prevailing party is entitled to an award of costs. Constantino v. American S/T Achilles, 580 F.2d 121, 123 (4th Cir.1978). Indeed, the rule gives rise to a presumption in favor of an award of costs to the prevailing party. Delta Air Lines, Inc. v. August, 450 U.S. 346, 352, 101 S.Ct. 1146, 1150, 67 L.Ed.2d 287 (1981); Coyne-Delany Co. v. Capital Dev. Bd. of Illinois, 717 F.2d 385, 390 (7th Cir.1983). We have stated that, in a case where the district court feels that aberration from this general rule is appropriate, the court must justify its decision by "articulating some good reason for doing so." Oak Hall Cap and Gown Co. v. Old Dominion Freight Line, Inc., 899 F.2d 291, 296 (4th Cir.1990); see Constantino, 580 F.2d at 123 (reversing the district court's denial of costs where the court stated no reason for its action).
 
 
 76
 We have yet to have occasion to elucidate what might constitute a "good reason" in this context. We look for guidance to the statements of our sister circuits on the matter. The Sixth Circuit has suggested that "good reasons" might include the excessiveness of costs in a particular case, actions taken by the prevailing party which unnecessarily prolonged trial or injected meritless issues, the fact that the prevailing party's recovery is so small that the prevailing party is victorious in name only, and the fact that the case in question was a close and difficult one. White & White, Inc. v. American Hosp. Supply Corp., 786 F.2d 728, 730 (6th Cir.1986). The Seventh Circuit has suggested that "good reasons" may arise from "objective factors[,] such as the resources of the parties, the defendant's efforts or lack thereof to mitigate his damages, and the outcome of the underlying suit." Coyne-Delany Co., 717 F.2d at 392.[26] The Seventh Circuit has also posited that the mere fact that a suit may have been brought in good faith is alone insufficient to warrant a denial of costs in favor of a prevailing defendant. Id. We agree; to hold otherwise would frustrate the rule that, in the ordinary case, a prevailing party is entitled to an award of costs, see id. This, of course, does not mean that good faith is not a valid factor to consider in determining whether an award of costs is appropriate; to the contrary, it seems to us that good faith on the part of a losing party would be a virtual prerequisite to a denial of costs in favor of the prevailing party.
 
 
 77
 With this background, we turn to the instant case. The district court found that plaintiffs had rebutted the presumption in favor of awarding Taggart and DH & S their costs on the grounds that plaintiffs had proceeded in good faith, that plaintiffs' case against Taggart and DH & S "was, for the most part, a relatively close and difficult case," J.A. 1815, and on the ground that, given that plaintiffs were in general of modest means and had fallen victim to Bakker's fraud, "it would be inequitable to tax the plaintiffs with the costs incurred by defendants [DH & S] and Taggart," id.
 
 
 78
 We review for abuse of discretion the district court's disposition of a victorious party's motion for costs. Oak Hall Cap and Gown Co., 899 F.2d at 296.[27] We cannot say that the district court abused its discretion in considering plaintiffs' good faith in pursuing claims against Taggart and DH & S, the closeness of the outcome, or the equities in conducting its analysis; nor do we find any abuse in the district court's conclusion.[28] We consequently reject Taggart's and DH & S's cross-appeals.
 
 CONCLUSION
 
 79
 We find no merit in plaintiffs' remaining assignments of error.[29] We reverse the district court's entry of judgment as a matter of law against plaintiffs on their securities fraud claims against Bakker and remand for further proceedings not inconsistent with this opinion. We otherwise affirm the judgments of the district court in all respects.
 
 
 80
 AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.
 
 
 
 [1]
 Prior to oral argument, DH & S made a motion to supplement the record. That motion is denied
 
 
 [2]
 As described just below, PTL offered various "partnerships" which purported to provide to purchasers the right to varying numbers of nights each year at various PTL hotels at Heritage, USA, the vacation retreat constructed by PTL. We refer to all such offerings collectively as LTPs and to purchasers of LTPs as "lifetime partners" or simply as "partners."
 
 
 [3]
 PTL's desire for unbridled growth is captured in the following passage found in a major PTL publication:
 Enlarge your house; build on additions; spread out your home! For you will soon be bursting at the seams ...
 Jim & Tammy Bakker, Jim & Tammy Bakker Present the Ministries of Heritage Village Church 198 (1986) (quoting Isaiah 54:2).
 
 
 [4]
 Bakker's extravagant benefits included the use of a luxury parsonage, complete with an air-conditioned treehouse and personal waterslide
 
 
 [5]
 We would inform counsel for the plaintiff class that the attempts taken to avoid the page limitation set by Federal Rule of Appellate Procedure 28(g) have not gone unnoticed. After the parties were granted a ten-page extension in the length of the briefs from 50 to 60 pages, counsel attempted to evade the 60 page limitation by improperly spacing words and citations, using footnotes for case cites rather than citing cases in the body of the brief, extending pages, and reducing margins. These tactics make it more difficult for this Court to read the plaintiffs' brief and extract the plaintiffs' arguments. Counsel should remember that "[j]udges are not like pigs, hunting for truffles buried in briefs." United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991). A client's interests are not furthered by drafting briefs which serve to camouflage legal issues. We would in general admonish all counsel that they, as officers of this Court, have a duty to uphold faithfully the rules of this Court
 
 
 [6]
 These two sections differ only slightly as far as wording and are generally accepted to be indistinguishable. E.g., Landreth Timber Co. v. Landreth, 471 U.S. 681, 686 n. 1, 105 S.Ct. 2297, 2301 n. 1, 85 L.Ed.2d 692 (1985). For purposes of this discussion we discuss, without distinguishing, cases addressing the definition of "security" under both acts
 
 
 [7]
 "Despite the restrictive language of the third prong of the test, later courts have explained that a program requiring some effort from the investor may still constitute an 'investment contract,' but the most essential functions or duties must be performed by others and not the investor." Bailey v. J.W.K. Properties, Inc., 904 F.2d 918, 920 (4th Cir.1990)
 
 
 [8]
 The parties do not contest that the remaining prongs of the Howey test can be met on the record before us. We note, in particular, that, because we find that "profits" under the LTP scheme are distributed pro rata to lifetime partners, there is horizontal commonality, see Revak v. SEC Realty Corp., 18 F.3d 81, 87 (2d Cir.1994), in this case. This means that we need not decide here whether some form of vertical commonality, see id. at 87-88, might satisfy the second prong of the Howey test
 The fact that there is horizontal commonality here also allows us to distinguish this case from Revak v. SEC Realty Corp., supra, and Wals v. Fox Hills Development Corp., 24 F.3d 1016 (7th Cir.1994), two recent cases where the Second and Seventh Circuits, respectively, found no security arising from the sale of condominium interests because of the absence of commonality. In particular, in Revak, there was no rental pool arrangement; that case involved merely the sale of condominiums. For that reason, the Second Circuit found that neither horizontal commonality nor strict vertical commonality, assuming the latter adequate to satisfy Howey, was present. Wals presented the Seventh Circuit with a case in which there were rental pool arrangements. The arrangements, however, were individual contracts between each purchaser and the developer. Because there was no overarching rental pool arrangement according to which profits would be distributed pro rata among all purchasers, the Seventh Circuit found that horizontal commonality, which that court reads the Howey test to require, was not present.
 
 
 [9]
 Forman does not preclude the possibility that an offering of real estate can, as a matter of law, constitute an offering of a security. E.g., Hocking v. Dubois, 885 F.2d 1449 (9th Cir.1989) (en banc), cert. denied, 494 U.S. 1078, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990). Indeed, "[w]hile it is true that ordinary real estate investments, e.g., the purchase of a dwelling, usually are not securities under either Federal or State law, the facts of each case determine whether or not particular instruments are securities." Kosnoski v. Bruce, 669 F.2d 944, 946 n. 3 (4th Cir.), cert. denied, 459 U.S. 832, 103 S.Ct. 72, 74 L.Ed.2d 71 (1982)
 We think that the same can be said of the offering of a timeshare. See Thomas Lee Hazen, Treatise on the Law of Securities Regulation Sec. 1.5, at 30 (2d ed.1990) ("the currently fashionable marketing of real estate interests through time-share or shared equity programs raises securities law issues because of the possibility of finding an investment contract"); cf. State v. Shade, 104 N.M. 710, 726 P.2d 864, 869-71 (Ct.App. 1986) (finding that timeshares can be securities under New Mexico securities law which employs the Howey test), writ quashed sub nom. Vincent v. State, 104 N.M. 702, 726 P.2d 856 (1986), overruled on unrelated grounds, State v. Olguin, --- N.M. ----, 879 P.2d 92 (Ct.App. 1994), cert. granted, --- N.M. ----, 879 P.2d 91 (1994). (Our use of the term "timeshares" to describe the LTPs at issue here in no way reflects upon the question of whether they qualify as "vacation time sharing plans" as that term is used in the SCTSA. Indeed, we conclude below that the LTPs are not subject to regulation under the SCTSA. See post, at 992-94.)
 The district court therefore erred in failing to consider the specific facts presented before granting the appellees' motion for a directed verdict. "An action [under the securities laws] should not be dismissed without an exploration of [the promotional] materials where ... the plaintiffs reasonably allege the existence of investment intent and common enterprise and where nothing in the complaint precludes the finding of a security." Aldrich v. McCulloch Properties, Inc., 627 F.2d 1036, 1040 (10th Cir.1980).
 
 
 [10]
 The footnote further emphasizes the economic aspect of the LTPs, stating:
 Based on estimated room rates and the average rate of inflation, the equivalent costs for a Lifetime Partner who stays in the Heritage Grand Hotel 3 nights, every year, for 40 years, would be approximately $19,500.
 J.A. 2185E n. *.
 
 
 [11]
 For example, on a January 22, 1986, broadcast, Bakker explained:
 Do you know, when somebody found out I was offering $1,000 for seven days and six nights every year, do you know what they [sic] said? You couldn't rent that suite for $1,000 a night for one night, is what it would rent for in a good hotel. So, that means, it is worth $7,000 or $6,000 just for the first week you stay in it.
 Tr. 2814.
 
 
 [12]
 It would make little sense for the existence of a "security" to turn solely on whether those who actually invest do so without regard to profit. Such a rule would be highly impractical. Would the existence of a "security" change according to each purchaser? If not, how many, or what percentage of, purchasers would have to have made their investments with an eye toward profits in order for there to be "securities"? Finally, how could the SEC be expected to regulate effectively where the existence of a "security" turns not on how and to whom an investment opportunity is offered, but only on those who ultimately undertake such an investment?
 We note that such a rule seems inconsistent with the Supreme Court's holding in SEC v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). There, the Court was faced with the claim by Ralston Purina Co. that an offering of company stock made to its employees was exempt under what is now Section 4(2) of the Securities Act of 1933, 15 U.S.C. Sec. 77d(2), pursuant to which "transactions by an issuer not involving any public offering" are exempt from regulation. Held the Court: "The focus of inquiry [as to whether an offering is public] should be on the need of the offerees for the protections afforded by registration." Id. at 127, 73 S.Ct. at 985 (emphasis added). The Court concluded that Ralston Purina Co. could not demonstrate that all the employees to whom it had offered stock had access to enough information about the company that it could be concluded that they were not in need of "the protections afforded by registration." Importantly, the Court did not look solely to those employees who, in fact, accepted the offer and purchased stock. This holding seems inconsistent with appellees' position: adoption of a test for the existence of a 'security' which looked only to actual purchasers would seem to undermine the Supreme Court's holding in Ralston Purina Co.
 
 
 [13]
 Appellees rely heavily upon the Eleventh Circuit's decision in Rice. There, Justice Powell, writing for the court, held that sales of lots in a residential housing development were not sales of "securities." Appellees make particular reference to the following statement by the court in Rice:
 We believe that people buy houses and lots in a beach-club development primarily to use them, not to derive profits from the entrepreneurial efforts of the developers.... The appellants have not offered any evidence to show that the majority or even a fair number of the buyers bought houses or lots as an investment.
 922 F.2d at 790-91 (citation omitted). Appellees argue that, here, appellants have similarly failed to provide evidence that any class members purchased LTPs as investments.
 Appellees' argument ignores the Eleventh Circuit's observation (one that, as noted in the text, we share) that, "[i]n addition to looking at the motivations of the purchasers, the Supreme Court also has looked to the emphasis provided in the promotional material to determine whether the sale of something is a sale of 'securities' for the purpose of federal securities law." 922 F.2d at 790. On this basis, the Eleventh Circuit relied, in support of its holding that no security was present, upon the fact that, in the case before it,
 the promotional materials published to sell the lots at the Landings do not emphasize the investment value of the lots. Of the several marketing items introduced into evidence, there was only one passing reference to buying the property as an investment. The overall emphasis in the promotional material was clearly placed on enjoying the beauty of the island and the amenities of the club and community.
 922 F.2d at 791 (citations omitted). The same cannot be said here. As described above, the promotional materials circulated by PTL cannot be said to have focused their emphasis clearly away from the profit aspects of the LTPs. We conclude that Rice is factually distinguishable from the case at bar.
 
 
 [14]
 Our use of the term 'timeshares' to describe the LTPs has no bearing on our analysis of whether the LTPs are subject to regulation under the SCTSA. See supra note 9
 
 
 [15]
 We note, however, that, although the Supreme Court of North Carolina in Skinner relied heavily upon the opinion of the United States Supreme Court in Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985), and found its "reasoning [to be] compelling," 333 S.E.2d at 239, the state supreme court nevertheless rejected the Court's conclusion that the in pari delicto defense might have some role to play in federal securities laws litigation, concluding that the defense was wholly inapplicable to insider trading actions brought under the North Carolina securities law, id. at 240
 
 
 [16]
 N.C.Gen.Stat. Sec. 78A-8 provides:
 It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:
 (1) To employ any device, scheme, or artifice to defraud,
 (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or,
 (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
 
 
 [17]
 The United States Supreme Court has, in many Section 10(b) cases, emphasized that the first resort, in determining the breadth of statutory and regulatory coverage, is to the language of the statute and that, while Rule 10b-5 may, on its face appear to embrace wider coverage than does Section 10(b), the SEC does not have the authority to broaden the coverage of Section 10(b) as enacted by Congress. E.g., Central Bank of Denver, --- U.S. at ----, 114 S.Ct. at 1446; Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 472-74, 97 S.Ct. 1292, 1300-01, 51 L.Ed.2d 480 (1977); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 212-14, 96 S.Ct. 1375, 1390-91, 47 L.Ed.2d 668 (1976). For example, in Hochfelder, 425 U.S. at 212, 96 S.Ct. at 1390, the Court observed:
 The [SEC] contends ... that subsections (b) and (c) of Rule 10b-5 are cast in language which--if standing alone--could encompass both intentional and negligent behavior.... Viewed in isolation the language of subsection (b), and arguably that of subsection (c), could be read as proscribing, respectively, any type of material misstatement or omission, and any course of conduct, that has the effect of defrauding investors, whether the wrongdoing was intentional or not.
 The Court concluded, however, that what Rule 10b-5 might mean if "[v]iewed in isolation" was irrelevant: at all events, the SEC could not, by regulation, broaden the statutory scope of Section 10(b), and the liability imposed by Section 10(b), the Court found, did not extend to negligent conduct, 425 U.S. at 214, 96 S.Ct. at 1391.
 We, of course, need not determine here whether Section 78A-8 extends to negligent conduct. We do, however, observe that such a determination is unclear in light of the similarity of Section 78A-8 to Rule 10b-5 and that, similarly, the determination of whether other issues resolved under Section 10(b) and Rule 10b-5, such as the determination of whether a private cause of action for aiding and abetting liability exists, would apply analogously to North Carolina securities law is unclear.
 
 
 [18]
 The opinion of the North Carolina Court of Appeals in State v. Williams, 98 N.C.App. 274, 390 S.E.2d 746, 750 (1990), where the court reviewed the criminal conviction of an attorney for violating N.C.Gen.Stat. Sec. 78A-8, provides additional support for this conclusion. There, although the question of criminal aiding and abetting liability under North Carolina securities law was not squarely raised, compare Central Bank of Denver, --- U.S. at ----, 114 S.Ct. at 1455 (noting that "an aider and abettor of a criminal violation of any provision of the 1934 Act, including Sec. 10(b), violates 18 U.S.C. Sec. 2"), the state appellate court in Williams strictly construed criminal liability under the state securities law. We believe that North Carolina courts would not construe the analogous civil liability significantly more broadly in this respect
 
 
 [19]
 Section 27-32-10(8) provides for an analogous definition for "vacation time sharing ownership plan" which requires that owners receive an undivided ownership interest in, as well as the right to use, the accommodations and/or facility in question
 
 
 [20]
 We do not mean for our citation to S.C.Code Ann. Sec. 32-3-10(5) to imply that that provision of that statute of frauds would apply to contracts regarding timeshare purchases. See S.C.Code Ann. Sec. 32-3-10(4) (requiring that "any action ... brought ... [t]o charge any person upon any contract or sale of lands, tenements or hereditaments or any interest in or concerning them" be in writing); id. Sec. 27-35-20 (requiring that "[a]ny agreement for the use or occupation of real estate for more than one year" be in writing); Player v. Chandler, 299 S.C. 101, 382 S.E.2d 891, 894 (1989) (suggesting that, in an action brought by lessees against lessors regarding oral modifications of a written lease contract, S.C.Code Ann. Secs. 32-3-10(4), 32-3-10(5), and 27-35-20 might all have applicability). We wish only to note that the concept that a contract that lasts only for a person's life is not considered to be a contract that necessarily extends for any length of time is quite common in our law and that, therefore, it is not unreasonable to expect that, had South Carolina's legislature intended to regulate timeshares that are keyed to the holder's life, it would have made that intention explicit in the statute
 
 
 [21]
 We feel compelled to note a grave error on the part of the trial court. The district court allowed into evidence the testimony of two "expert witnesses" called by DH & S: David Martin, who, while serving as general counsel to the South Carolina Real Estate Commission, drafted the SCTSA; and Aleta Pillick, an attorney who, while in her former employ with the South Carolina Tax Commission, investigated the LTPs and concluded that they were not timeshares. By admitting this evidence, the district court treated the proper interpretation of the relevant statutory provision, S.C.Code Ann. Sec. 27-32-10(9), as a matter properly resolved by the jury. As we make clear in the text, this question is purely one of law and is properly resolved by the court; indeed, the proper resolution of this question mandates judgment for appellees, leaving nothing for the jury to determine. Moreover, even were there a material question of fact relating to the duration of the LTPs, it would still be error for the district court to have allowed the testimony of the witnesses listed above into evidence. Expert testimony as to the proper interpretation of applicable domestic law is inadmissible. Adalman v. Baker, Watts & Co., 807 F.2d 359, 366-67 (4th Cir.1986). "[I]t is the responsibility--and the duty--of the court to state to the jury the meaning and applicability of appropriate law, leaving to the jury the task of determining the facts which may or may not bring the challenged conduct within the scope of the court's instruction as to the law." Id. at 366. See Fed.R.Evid. 702 (expert testimony is admissible to the extent that it "will assist the trier of fact to understand the evidence or to determine a fact in issue" (emphasis added))
 
 
 [22]
 Plaintiffs raise, in addition, two legal arguments with regard to the district court's handling of their common law fraud claim against DH & S. They first argue that the district court's jury instruction misled the jury with respect to the applicable statute of limitation. North Carolina law requires that an action for fraud be brought within three years of the accrual of the cause of action; "the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." N.C.Gen.Stat.Sec. 1-52(9). Plaintiffs argue that the district court's jury instruction left the jury with the impression that the three-year statute of limitation ran, without qualification, from the date the fraud was perpetrated and not from the date the fraud was, or should reasonably have been, discovered. The record refutes this argument, however. The jury instruction, as a whole, adequately elucidated the relevant law. Thus, although the statute of limitations instruction need not have been delivered as it appears that no Lifetime Partners were aware of PTL's financial difficulties until 1986, the delivery of the instruction led to no prejudicial error
 Plaintiffs also allege that the district court erred in prohibiting counsel for plaintiffs from making reference to DH & S's failure to call a witness who, plaintiffs claim, would have substantiated their fraud claims against DH & S. In order for it to be appropriate for the jury to draw an adverse inference from the failure of a party to call a witness, the witness must not be "equally available to either party." Dunlap v. G. & C. Towing, Inc., 613 F.2d 493, 497 (4th Cir.1980). In Dunlap, we noted that plaintiff's treating physician was, in fact, "equally available to either party." Id. Here, Fisher, a former employee of DH & S, was, at the time of trial, no longer in DH & S's employ. We see no reason why Fisher was not equally available to be called by plaintiffs as by DH & S and, consequently, find no error in the district court's action.
 
 
 [23]
 Plaintiffs also raise two matters of law with respect to the RICO and NC-RICO verdicts. Plaintiffs first submit that the district court erred in leaving it to the jury to determine whether Bakker committed the requisite RICO predicate acts. They argue that, in light of Bakker's previous convictions, affirmed by this Court, for mail and wire fraud, that element of RICO and NC-RICO was established by collateral estoppel. Plaintiffs failed to raise this argument to the district court, whether in the form of a motion for partial summary judgment, suggested jury instructions or otherwise. Given plaintiffs' failure to raise the issue of collateral estoppel to the court below, we decline to consider the argument here. See Liberty Corp. v. NCNB Nat'l Bank of South Carolina, 984 F.2d 1383, 1389-90 (4th Cir.1993)
 Plaintiffs next argue that the jury instructions delivered by the district court were erroneous in three respects. They first argue that error arose because the instructions referred to RICO predicate acts as "crimes." At no time, however, did the district court instruct the jury that RICO required proof of a predicate act beyond a reasonable doubt. Review of the record, however, convinces us that the RICO jury instructions, taken as a whole, fairly state the applicable law in this regard.
 Second, with respect to the court's NC-RICO instructions, the district court instructed the jury that proof beyond a reasonable doubt was required under NC-RICO. Plaintiffs agreed below that proof beyond a reasonable doubt was required with respect to Bakker's primary NC-RICO violation but argue that the district court erred in instructing the jury to apply that standard to DH & S's alleged action aiding and abetting Bakker's primary violation. Because the jury found that Bakker had not committed a primary violation, any error in this regard is harmless. We would further note that the fact that the district court emphasized to the jury that it should apply the reasonable doubt standard under NC-RICO supports our conclusion that the jury did not, due to a misunderstanding of the court's instructions, apply the reasonable doubt standard to plaintiffs' RICO claims.
 Last, plaintiffs argue that the district court misinstructed the jury as to 18 U.S.C. Sec. 1962(b), which provides:
 It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
 Plaintiffs argue that Section 1962(b) does not require direct equity ownership in the RICO enterprise as plaintiffs contend is required by the court's instruction to the jury that "[a]cquiring an interest in an enterprise means acquiring of [sic] stock or ownership equity, and not merely the existence of an employment relationship with the enterprise." Tr. 8083-84. Further along in the instruction, however, the court instructed: "In order for you to find that plaintiffs have established [that Bakker acquired or maintained an interest in PTL], you must find that Bakker .... gained actual day-to-day involvement in the management and operation of PTL." Tr. 8086. We believe that this explanation sufficiently removed any thoughts the jury might have had that, to find that Bakker acquired an interest in PTL, it had to find that Bakker acquired an equity interest in PTL. We therefore reject plaintiffs' argument. An analogous argument under NC-RICO similarly fails.
 
 
 [24]
 We note, however, that "Bakker does not contest the certification of the class." Appellees' Br. 58
 
 
 [25]
 Taggert's and DH & S's motion was, in fact, made pursuant to former Rule 54(d), which, following 1993 amendment of the rule, is now contained, without substantive change except for an express provision that motions for attorney's fees are not meant to be addressed therein, in Rule 54(d)(1)
 
 
 [26]
 But see Congregation of the Passion, Holy Cross Province v. Touche, Ross & Co., 854 F.2d 219, 222 (7th Cir.1988) ("Generally, only misconduct by the prevailing party worthy of a penalty or the losing party's inability to pay will suffice to justify denying costs."); Schwarz v. Folloder, 767 F.2d 125, 131 (5th Cir.1985) (describing the denial of costs as in the nature of a penalty); Serna v. Manzano, 616 F.2d 1165, 1167 (10th Cir.1980) (same)
 
 
 [27]
 The Seventh Circuit has suggested that the "abuse of discretion" standard in reviewing Rule 54(d) motions "merges into the standard of simple error used in reviewing decisions of questions of law." Coyne-Delany Co., 717 F.2d at 392. We would simply note that our precedent endorses, without question, the abuse of discretion standard
 
 
 [28]
 We recognize that the district court awarded costs to Cortese and that the only apparent difference between plaintiffs' case against her and their cases against DH & S and Taggert is that the district court felt that the case against Cortese "was neither close nor difficult." J.A. 1816. The district court did not abuse its discretion in determining that, in this case, that factor tipped the scales as to the fortunes of the various parties in this regard
 
 
 [29]
 We note that plaintiffs claim prejudicial error arising from the district court's decision not to allow plaintiffs to call an expert securities witness because of plaintiffs' tardiness in naming the expert. Given our disposition of plaintiffs' securities fraud claims, we see no reason to address this contention