Filed: December 3, 2003

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

———————————

Nos. 01-4630(L)
(CR-99-396)

———————————

United States of America,

Plaintiff - Appellee,

versus

Christopher Andaryl Wills, etc.,

Defendant - Appellant.

———————————

O R D E R

———————————

The court amends its opinion filed October 7, 2003, and reported at 346 F.3d 476 as follows:

On page 30, first full paragraph, line 8 -- the date of "July 25" is corrected to read "June 25."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  v.                                          No. 01-4630

CHRISTOPHER ANDARYL WILLS, a/k/a
Ed Short, a/k/a Michael Wills,
  *Defendant-Appellant.*

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  v.                                          No. 01-4813

CHRISTOPHER ANDARYL WILLS, a/k/a
Ed Short, a/k/a Michael Wills,
  *Defendant-Appellant.*

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  v.                                          No. 01-4964

CHRISTOPHER ANDARYL WILLS, a/k/a
Ed Short, a/k/a Michael Wills,
  *Defendant-Appellant.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CR-99-396)

Argued: April 4, 2003

Decided: October 7, 2003

Before WIDENER, WILKINSON, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Widener wrote the opinion, in which Judge Wilkinson and Judge Motz concurred.

_____

## COUNSEL

**ARGUED:** Jonathan D. Hacker, O'MELVENY & MYERS, L.L.P., Washington, D.C., for Appellant. James L. Trump, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Alan H. Yamamoto, Alexandria, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Kevin V. Di Gregory, Assistant United States Attorney, Vincent L. Gambale, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

## OPINION

WIDENER, Circuit Judge:

The defendant, Christopher Andaryl Wills, was convicted of kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1), and interstate stalking resulting in death, in violation of 18 U.S.C. § 2261A. On appeal, Wills raises a multitude of issues, challenging his convictions and sentence. For the reasons that follow, we affirm Wills' convictions and sentence.[1]

I.

At approximately 2:00 a.m. on April 4, 1998, Zabiullah Alam returned home from work to the apartment that he shared with his two

_____

[1] On March 6, 2003, Wills filed a *pro se* motion for leave to file a supplemental memorandum of law out of time. We grant the motion.

2

aunts and a cousin. Upon his return, Alam discovered an intruder, whom he later identified as the defendant, Christopher Wills, in the living room of his apartment holding his aunt's purse. Wills fled by jumping off the apartment balcony, taking with him Alam's aunt's purse and his cousin's pants and wallet. After a high speed chase, the Fairfax County, Virginia police arrested Wills and charged him with burglary.

On June 15, 1998, a preliminary hearing was held in the Fairfax County General District Court. During the hearing, Alam appeared as the Commonwealth's sole witness and identified Wills as the person whom he had discovered burglarizing his home. The court determined that there was probable cause to believe that Wills committed the burglary and bound the case over to the state grand jury. The grand jury was scheduled to meet on July 20, 1998, and Wills, if indicted, would have been arraigned on July 21, 1998. Wills was then released on bond.

During the evening of June 15, 1998, Wills spoke via telephone to his brother, Michael Wills, who was incarcerated at the Augusta Correctional Facility near Staunton, Virginia. The facility monitored and recorded its prisoners' telephone conversations. During the call, Wills discussed the preliminary hearing which took place earlier that day. Wills described how Alam identified him at the hearing and made several statements indicating that he was formulating a plan to stop Alam from testifying against him.[2]

---

[2] After Wills recounted Alam's identification of him at the hearing, Wills stated, "But I ain't got time to leave it at that" and then stated, "That ain't no joke." Later during the conversation, Wills and his brother further discussed the hearing and indicated plans to stop Alam:

> Michael Wills: You know what happened today, right?
>
> Christopher Wills: Huh?
>
> Michael Wills: You know what happened today for you, when you, when you went —
>
> Christopher Wills: When I went where I went?
>
> Michael Wills: Yes.
>
> Christopher Wills: Um-hum.

3

On or about June 17, 1998, a man, later identified by sales representative Reginald Johnson to be Christopher Wills, obtained Cellular

---

Michael Wills: You can't think on that, Shorty.

Christopher Wills: Huh?

Michael Wills: You can't think on it.

Christopher Wills: Come on now, who you talking to?

Michael Wills: (Unintelligible.)

Christopher Wills: All it is. I gotta do it and do it and now, you know what I mean?

Michael Wills: Yeah, check it out.

Christopher Wills: I'm, I'm just thinking on how, you know.

Michael Wills: Yeah.

Christopher Wills: On the strength of basically all that I know. You know what I mean? Understand, it, it's [sic] spot, location.

Michael Wills: Yeah.

Christopher Wills: And look.

Michael Wills: Yeah.

Christopher Wills: I need to know wheels; you know what I'm saying?

Michael Wills: I got you. I got you. I got you. I got you.

Christopher Wills: The other —

Michael Wills: I got you.

Christopher Wills: And then I can tee it on it perfect.

Michael Wills: I got you.

Christopher Wills: Other than that, I've got to use some trickery.

Michael Wills: Hey.

Christopher Wills: Ah, but it's gonna get done through, you know, that.

During another conversation on June 15, 1998, Wills further described the preliminary hearing and appeared to describe how he had his "peoples" follow Alam:

4

One service for a pre-existing cell phone at a Radio Shack in Washington, D.C., using the fictitious name "Ed Short." He prepaid for the service in cash and listed what was later determined to be a fictitious address in Temple Hills, Maryland as his residence. On or about June 18, 1998, a flier was left under Alam's door advertising a grounds keeping job at an apartment complex, which paid $11.00 an hour plus benefits. The flier listed the telephone number of the cellular service activated by "Ed Short." On June 18, 1998, Wills spoke with his brother and stated that he had put "Plan A in action, right."

On or about June 18, 1998, Wills returned to the same Radio Shack, complaining that the cell phone did not function properly. On June 19, 1998, or sometime thereafter, the government contends that a handwritten note dated "6/19/98" was left at Alam's apartment which read, "Wer'e [sic] sorry that our phones were down yesterday 6/18/98 *Please!* Try our line again. Were [sic] open 7 days a week. Jobs!!"[3] At the bottom of the note the same telephone number was

---

Christopher Wills: They, they they did, 'cause I had my peoples on, on Baywatch.

Michael Wills: Yeah.

\* \* \* \*

Christopher Wills: The peoples was undercover, Shorty. You know how I play.

Michael Wills: Yeah.

Christopher Wills: People's undercover sittin' right with him.

Michael Wills: Yeah.

Christopher Wills: And peoples stayed on him for me.

Michael Wills: Yeah.

Christopher Wills: But they slipped up. I told them to check wheels, and they, they slipped on that. You understand?

Michael Wills: Yeah.

Christopher Wills: They slipped on that, `cause when them people put the cuffs, they lost their mind. Told them they can't do that, see? "`Cause by trippin', you just cost me the wheels."

[3] Alam's aunt found the note with tape stuck to it among Alam's papers in November 1998 and turned it over to the police.

5

listed. On the evening of June 19, 1998, Wills again spoke with his brother and referred to being at Radio Shack and to the fliers and indicated that the phone which he had activated was not functioning properly.[4]

Prior to his disappearance, Alam told his family and friends that he had called the number listed on the fliers to arrange an interview for the grounds keeping job. Alam told them that he had scheduled the job interview for 5 p.m. on June 25, 1998 in Washington, D.C. Also prior to Alam's disappearance, Alam's cousin took a telephone message for Alam from a man who identified himself as Feleec or Felliece[5]

---

[4] The following is an excerpt from the June 19, 1998 conversation:

> Christopher Wills: I haven't been do sh- — I'm trying to get this dude, man. If I don't, my ass is grass.
>
> Michael Wills: Yeah.
>
> Christopher Wills: You hear what I am saying?
>
> Michael Wills: Yeah.
>
> Christopher Wills: And the joint that I got plugged in for him to dial was fucked up, so they could have been calling me.
>
> Michael Wills: Yeah.
>
> Christopher Wills: You know what I mean? I'm getting, I'm, I'm, I'm hitting with the draw-out moves, to come to come (unintelligible). You know what I mean?
>
> Michael Wills: Yeah.
>
> Christopher Wills: I got this and I, I already got the fliers out and everything, so I'm just waiting, you know, for them to get it and call, and, I ain't got no calls yet, man. I — and I'm, and I'm — I don't wanna give them up; you know what I mean? I'm, I'm trying to, you know, figure out how to go at him.
>
> Michael Wills: Yeah, yeah, yeah. I got it.

[5] At trial, the government offered evidence that the same name was used twice in 1998 by a man calling the Augusta Correctional Center who claimed to be an attorney for Michael Wills. During those calls, "Feleec" gave Christopher Wills' telephone number as his own. He also gave Wills' Washington, D.C. home address and his business address as his own.

6

(phonetic) and who said that he was calling with regard to the grounds keeping job. The man gave the number listed on the fliers as his telephone number.

On June 25, 1998, the day of his scheduled interview, Alam returned a page message that he had received while he was with his friend, Ali Muradi. While Muradi listened, Alam discussed the grounds keeping job with a Mr. Felliece and later told Muradi that he was to meet Mr. Felliece's secretary at Union Station. At approximately 5 p.m. that night, Alam left Muradi's apartment in Fairfax County, Virginia for the job interview. At 6:03 p.m., Alam was stopped by a District of Columbia police officer on the 1200 block of F Street, N.W., Washington, D.C., and was given a citation for not wearing his seat belt.

On June 26, 1998, after not hearing from Alam since he left for his interview, Alam's family reported him missing to the Fairfax County police. Also on June 26, Michael Wills called Christopher Wills and asked him, "You handle the business?" Wills replied, "Yeah." Then Michael Wills asked, "Everything taken care of?" and Wills replied, "Taken care of." In a second conversation on June 26, Wills attempted to describe what had taken place by using references to the movie, CASINO.[6] In a later conversation, Michael Wills asked his brother,

---

[6] The conversation was as follows:

> Christopher Wills: Hey, I'm gonna tell you some things right.
>
> Michael Wills: Yeah.
>
> Christopher Wills: But you know I can't say it on the phone, 'cause it pertains to something, you know.
>
> Michael Wills: Yeah.
>
> Christopher Wills: But anyway, I'm going to tell you about it. You know me, I'm, I'm, I'm, I'm, I'm, I'm, I'm, I'm *Casino*.
>
> Michael Wills: Yeah.
>
> Christopher Wills: You see the movie?
>
> Michael Wills: Yeah.
>
> Christopher Wills: All right.
>
> Michael Wills: No, I ain't seen the movie.

7

"You got rid of all of that, didn't you?" and Christopher Wills responded, "why you had to go there?" Wills then told his brother, Michael, that his "people" were "on the scene, but they don't know disposal" and "[a]ll they can say is I saw, but take us to, can't do."[7]

---

Christopher Wills: You didn't?

Michael Wills: No. We don't see that shit down here.

Christopher Wills: Good God Almighty. Well anyway, I was doing a *Casino* joint, right?

Michael Wills: Yeah.

Christopher Wills: Do you know — Mike?

Michael Wills: Yeah.

Christopher Wills: Going down, sweating ass naked, getting shit ready, right?

Michael Wills: Yeah.

[7] The complete conversation was as follows:

Michael Wills: You know, you know, you know, you move, you move yet?

Christopher Wills: Huh?

Michael Wills: You know, did (unintelligible) you already moved?

Christopher Wills: What about it?

Michael Wills: You got rid of all of that, didn't you?

Christopher Wills: Mike, what you — why you had to go there?

Michael Wills: (Unintelligible)

Christopher Wills: Mike.

Michael Wills: What?

Christopher Wills: I've been in jail for eight years. I've done seen every motherfucking *Unsolved Mystery*, every *America's Most Wanted*, every *Cops*, every motherfucking *New York Undercover*, every *NYPPD*, everything. I've read every newspaper came out every day, every Metro section, every paper Cou-, County West. Come on, listen, who are you

8

talking to? Goddamn, man. What — where,
where you at?

Michael Wills: You know. You know, but them people,
your peoples don't, ah —

Christopher Wills: But see, see, see, see.

Michael Wills: But your people don't have the scoop do
they?

Christopher Wills: Listen.

Michael Wills: What?

Christopher Wills: What you don't understand. See I'm not
even going to picket. I'll talk to you tomor-
row.

Michael Wills: Okay.

Christopher Wills: You, you talking about went, went, went,
went. The nigger ain't went a motherfuck-
ing place. See, that's where you sleeping at.

I know what I'm doing, nigger. I ain't have
to show my face, nigger. I know what the
fuck I'm doing. I got this. I got this.

Michael Wills: All right.

Christopher Wills: Nigger, I know what the fuck I'm doing.
Ain't nobody going nowhere and showing
up nowhere or nothing, nigger. I ain't no
fool, you understand?

Michael Wills: So what, but, but —

Christopher Wills: Baby, I handle, I handle my business, nig-
ger. I ain't had to show my face, period.

Michael Wills: The people at the (unintelligible), they ain't
— them people ain't got no scoop, do they?

Christopher Wills: Who?

Michael Wills: Your people.

Christopher Wills: What?

9

an apartment parking lot in Prince George's County, Maryland. Alam has not been seen since June 25, 1998.

On November 3, 1999, a federal grand jury sitting in the Eastern District of Virginia returned an indictment charging Christopher Wills with one count of kidnapping in violation of 18 U.S.C. § 1201(a)(1). On December 9, 1999, a superseding indictment was returned which included one count of interstate stalking resulting in death in violation of 18 U.S.C. § 2261A. On February 3, 2000, a second superseding indictment was returned, which included minor changes.

On December 13, 1999, Wills appeared in court for arraignment on his superceding indictment. While he was there, Wills spoke with another prisoner, James Black, who commented that Wills would be eligible to receive the death penalty, if convicted. In response to

---

Michael Wills: Your people ain't got no scoop, do they?

Christopher Wills: Yeah. They was on the scene, but they don't know disposal. You see what I'm saying?

Michael Wills: Huh?

Christopher Wills: They could. I said they're on the scene.

Michael Wills: Yeah.

Christopher Wills: You understand?

Michael Wills: Yeah.

Christopher Wills: Go sit down, Crystal.

Michael Wills: (Laughs.)

Christopher Wills: All they could say is I saw, but take us to, can't do. You understand?

Michael Wills: Yeah.

Christopher Wills: You see what I'm saying? Oh, I, I don't know what your talking about. They're lying. They're just making it up.

Michael Wills: Yeah.

Christopher Wills: You understand?

Michael Wills: Yeah.

10

Black's comment, Wills said that he would not receive the death penalty because "they'll never find the body." Alonzo Nichols, another prisoner in court that day, overheard Wills' conversation with Black. Nichols recalled Wills telling Black, "They can't give me the death penalty because they ain't never going to find the body."

On December 16, 1999, Wills filed a motion to dismiss Count One of the indictment (the kidnapping count) for lack of subject matter jurisdiction and for insufficiency of the offense charged. On February 4, 2000, Wills filed a motion to dismiss Count Two of the indictment (the interstate stalking count), arguing that the facts were insufficient for a grand jury to find probable cause to indict him for interstate stalking.

On February 15, 2000, the district court granted Wills' motion to dismiss Count One of the indictment (the kidnapping count) for lack of jurisdiction and denied his motion to dismiss Count Two of the indictment (the interstate stalking count). The government filed an interlocutory appeal with this court. In *United States v. Wills*, 234 F.3d 174 (4th Cir. 2000) (hereinafter *Wills I* ), this court addressed the issue of "whether jurisdiction is established under the Federal Kidnapping Act when a victim, acting because of false pretenses initiated at the instance of the defendant, transports himself across state lines without accompaniment by the alleged perpetrator or an accomplice." *Wills I*, 234 F.3d at 176. This court found that"[t]he plain language of the [Federal Kidnapping] Act does not require that the defendant accompany, physically transport, or provide for the physical transportation of the victim. Rather the Act only requires that the victim `is willfully transported.'" *Wills I* at 178. Because the facts supported a finding that Alam was "willfully transported" we vacated the district court's order and remanded the case. See *United States v. Wills*, 234 F.3d 174, 179 (4th Cir. 2000) (*Wills I*).

On September 4, 2001, a three-week jury trial commenced, in which Wills appeared *pro se* with two attorneys acting as standby counsel. During the trial, the government introduced transcripts of Wills' telephone conversations with his brother, including the conversation in which Wills referred to the movie, CASINO. When the government sought to introduce the entire movie as an exhibit, the court suggested that the parties attempt to reach a stipulation regarding the

11

content of the movie. After the parties were unable to reach a stipulation, the court entered the entire movie into evidence and allowed both parties to play excerpts of the movie for the jury.

The government also introduced records of Cingular Wireless, successor to Cellular One, through the testimony of its Asset Protection Manager, Neal Carver. These records showed that on June 17, 1998, a man identifying himself as Edward Short or Ed Short purchased pre-paid Cellular One service at a Radio Shack located at 1528 Benning Road, N.E., Washington, D.C. The records further indicated that an electronic serial number (ESN) change, or phone change, was made on June 22, 1998 to allow the phone number given to Edward Short to be used with a telephone previously used with another Cellular One account in the name of Christopher Wills.

At trial, Carver explained that all cell phones have an ESN that is unique to each and is permanent. ESN is an electronic record number imbedded in the phone by the manufacturer. He further testified that an ESN change occurs when a customer switches telephones on an account while retaining the same telephone number. Once an ESN change is made, the ESN, or phone, previously associated with the telephone number will not work.

Cellular One records documented calls made from Edward Short's phone number to Alam's home telephone on June 23 and June 24. In addition, the records indicated that three calls were made from Short's phone number to Alam's pager on June 25.

At trial, Wills attempted to explain the ESN change by claiming that his telephone began to receive mysterious calls. Notably, Wills, however, did not account for the outgoing calls made from his phone to Alam's home number and pager.

During trial, the government argued that there was also no evidence to suggest that Alam's failure to return home was anything but involuntary. The government presented testimony that when Alam left for his interview, he did not give any indication that he would not be returning home. Alam never returned to his job at the Fish Market Restaurant in Old Town Alexandria, Virginia and never collected his paycheck. Alam also took little cash with him and had no credit cards,

12

passport, or travel documents. The government presented further evidence that Alam was about to become a United States citizen and had no desire to return to Afghanistan.

On October 1, 2001, the jury returned a guilty verdict on both the kidnapping count and the interstate stalking count. After a separate penalty hearing on October 4, 2003, the jury recommended a sentence of life imprisonment without parole on the kidnapping count. The district court sentenced Wills to life imprisonment without parole on both counts, to be served concurrently; five years of supervised release on each count to be served concurrently; and a $200 special assessment. This appeal followed.

## II.

### A. *Federal Jurisdiction*

As an initial matter, Wills argues that the government failed to establish federal jurisdiction because the government did not prove that Alam was "willfully transported in interstate commerce" under 18 U.S.C. § 1201(a)(1).[8] In addition, Wills argues that the government failed to prove that Wills or someone acting at his direction traveled in interstate commerce in kidnapping Alam.

---

[8] 18 U.S.C. § 1201 provides, in pertinent part:

> (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, . . . when —
>
> (1) the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary if the person was alive when the transportation began;
>
> * * *
>
> shall be punished by imprisonment for any term of years or for life and, if the death of a person results, shall be punished by death or life imprisonment.

18 U.S.C. § 1201(a) (2000).

13

In *Wills I*, we held that the "willfully transported" element of 18 U.S.C. § 1201(a)(1) did not contain an accompaniment requirement and found that "the fact that Wills caused unaccompanied travel over state lines [was] sufficient to confer jurisdiction." *Wills I*, 234 F.3d at 179. We adhere to our decision in *Wills I* and are of opinion that federal jurisdiction has been established.[9]

### B. *Res Judicata, Collateral Estoppel, & Double Jeopardy*

Wills argues that the district court dismissed Count One (the kidnapping count) of the indictment in two distinct rulings: (1) a legal ruling that the government had failed to establish federal jurisdiction because Alam drove unaccompanied across state lines, and (2) a factual ruling that the government had failed to establish that Alam had been restrained or held at any point in Virginia prior to his interstate travel. Wills contends that because this court only addressed the district court's ruling on unaccompanied interstate travel, the district court's factual finding on the holding element became final. Thus, Wills argues that relitigation of the kidnapping count was barred by the district court's prior decision on the holding element. Wills contends that the district court's subsequent trial on the kidnapping count constituted double jeopardy. We disagree.

In dismissing the kidnapping count, the district court explicitly stated that it was accepting as true the allegations as stated in the indictment. The district court then determined that the indictment had failed to establish federal jurisdiction because the allegations did not state that Alam was not transported in interstate commerce by Wills or by someone acting on his behalf. In denying the government's motion for reconsideration, the district court stated that the "[d]efendant argues that the indictment fails to allege facts sufficient to satisfy other elements such as the requirement that the defendant be held. Because the indictment's failure to satisfy the jurisdictional element is fatal, we do not address these other arguments." See *United States v. Christopher Wills*, No. 99-396, slip op. at 2 n.1 (E.D. Va. Mar. 17, 2000). Thus, the district court did not make any factual find-

---

[9] Accordingly, we find without merit Wills' claim that the district court erred in failing to dismiss Count One of the indictment (the kidnapping count) for lack of jurisdiction and failure to allege a federal offense.

ings in dismissing Count One of the indictment. Furthermore, the dismissal for lack of jurisdiction was not an adjudication on the merits or an acquittal. Therefore, the principles of collateral estoppel, *res judicata*, or double jeopardy are inapplicable and Wills' argument is without merit.

## C. *Venue*

Wills also contends that the district court was without venue pursuant to 18 U.S.C. § 3237(a) to conduct the trial on the kidnapping count. Wills argues that the kidnapping occurred in Washington, D.C., not in the Eastern District of Virginia, because a kidnapping offense does not begin until the victim is involuntarily seized and held. Wills claims that Alam was not held until he transported himself into Washington, D.C.

Kidnapping is a continuing crime which begins the moment that the victim is unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away. See *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281-82 (1999) ("Kidnaping . . . was committed in all of the places that any part of it took place, and venue for the kidnaping charge . . . was appropriate in any of them."); see also *United States v. Seals*, 130 F.3d 451, 461-63 (D.C. Cir. 1997). Thus, venue was appropriate in the Eastern District of Virginia, where Alam was inveigled and decoyed. Accordingly, we hold that Wills' lack of venue claim is without merit.

## D. *Indictment for Interstate Stalking*

Also as an initial matter, Wills argues that the district court erred in failing to dismiss Count Two of the indictment (the interstate stalking count) for insufficiency of the alleged facts to support the offense charged. More specifically, Wills claims that the facts alleged in the indictment were insufficient to support the fear element of interstate stalking.

This court has held that courts lack authority to review the sufficiency of evidence supporting an indictment, even when a mistake was mistakenly made. See *United States v. Mills*, 995 F.2d 480, 487

15

(4th Cir. 1983); see also *Costello v. United States*, 350 U.S. 359, 363-64 (1956) ("Petitioner urges that this Court . . . establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence. No persuasive reasons are advanced for establishing such a rule. It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules."). Furthermore, "[a]n indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charges on the merits." *Mills*, 995 F.2d at 487. Because the indictment tracks the language of 18 U.S.C. § 2261A (the interstate stalking statute) and properly alleges each element of the statute, the indictment is valid on its face. Thus, we hold the district court correctly did not dismiss Count Two of the indictment.

III.

Wills raises several challenges to the district court's evidentiary rulings, each of which we will address individually.

A. *Admission of Movie, CASINO, into Evidence*

Wills argues that the district court erred by allowing the government to play an excerpt from the movie, CASINO. The parties dispute whether Wills objected to the admission of the movie into evidence. The defense maintains that Wills noted timely objections to the admission of the movie while the government contends that Wills failed to object contemporaneously. After a review of the record, we agree with the government that Wills did not contemporaneously object to the admission of the film into evidence.[10] Thus, we review

---

[10] Prior to trial, on September 4, 2001, Wills filed a motion *in limine* requesting the court to prohibit the government from using the movie as evidence. The district court stated that the movie was relevant because Wills referred to the movie during a conversation with his brother. The court suggested that the parties attempt to reach a stipulation as to the content of the movie. After the parties were unable to agree upon a stipulation, the court entered the movie into evidence and noted that half of the jury had already seen the movie. Wills responded, "Thank you."

the district court's decision for plain error. See *United States v. Olano*, 507 U.S. 725 (1993).

We are of opinion that the district court did not commit error, plain or otherwise. The court ruled that the movie was relevant. This ruling as to relevance was not an abuse of discretion because Wills mentioned CASINO in the taped telephone conversations with his brother, and the movie undoubtedly explained the meaning of the conversation. Thus, there was no error because the evidence was relevant and the district court's decision was not an abuse of discretion.

### B. *Admission of Recorded Telephone Conversations*

Wills contends that the district court improperly admitted recorded telephone conversations between Wills and his brother, Michael Wills, and transcripts of those conversations. We decided some years ago that such transcripts are admissible. See *United States v. Soc'y of Indep. Gasoline Marketers of Am.*, 624 F.2d 461, 474 (4th Cir. 1979) (Widener, Circuit Judge, concurring). Wills argues that Michael Wills' recorded statements were hearsay and that admission of those statements violated his Sixth Amendment right to confront the witnesses against him.

Christopher Wills' own statements, which were recorded during those conversations, were admissions by a party-opponent and were admissible pursuant to Federal Rule of Evidence 801(d)(2)(A). We agree with the district court, as it held that Michael Wills' statements were also admissible. They were reasonably required to place Christopher Wills' responses into context. Accordingly, Michael Wills' statements were properly admitted to make Christopher Wills' statements,

---

Later during the trial, the district court entered the movie into evidence. When the government requested permission to play an excerpt of the movie, Wills' standby counsel, Mr. Shapiro, approached the bench and stated, "I am constrained to do this. But I think that I must put my personal objection on the record to the playing of this tape. I want the record to reflect that it is over my strenuous objection, but Mr. Wills, it is his decision." Hence, Wills did not object to the playing of the movie excerpt.

17

so far as they constituted incriminating admissions, "intelligible to the jury and recognizable as admissions." *United States v. Lemonakis*, 485 F.2d 941, 948 (D.C. Cir. 1973). Thus, the district court did not err by admitting the tapes and transcripts.

## C.  *Admission of Cell Phone Records*

Wills also argues that the records of Cingular Wireless, formerly known as Cellular One, were erroneously admitted as business records because they contained information provided by Radio Shack sales representatives. Wills claims that the district court erred in ruling that the records were reliable because the court failed to determine the truthfulness of the information provided by Radio Shack to Cellular One pursuant to Federal Rule of Evidence 803(6).[11]

We are of opinion that the method of compilation of the records does not indicate a lack of trustworthiness. Cellular One's Asset Protection Manager testified that Cellular One offered its services to the public through various distribution channels, including retail centers like Radio Shack. The retail centers must transmit the cell phone's unique ESN to Cellular One in order for the customer to receive Cellular One service. Thus, the information submitted by Radio Shack to Cellular One occurred in the regular course of business and does not show a lack of trustworthiness, either in source of preparation or in method of preparation. Therefore, the district court did not err in admitting the documents as business records.

---

[11] Fed. R. Evid. 803(6) provides an exception to the hearsay rule:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by a person with knowledge, if kept in the course of a regularly conducted business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

18

IV.

Wills asserts that the district court's exclusion of certain testimony and exhibits offered by Wills prevented Wills from presenting his defense and effectively representing himself.

A. *Photo Spread*

Four days before the preliminary hearing in the Virginia court at which Alam identified Wills as the man whom he had discovered burglarizing his home, Fairfax County Police Detective Michael Feightner showed Alam a six picture photo spread containing Wills' picture. Alam identified Wills from this spread as the burglar. On February 11, 2000, a motions hearing was held in the district court, at which Detective Feightner testified that during the photo lineup prior to the Virginia preliminary hearing, he had told Alam that Wills' picture was among those displayed. The district court denied Wills' motion to suppress the photo identification. At trial, the district court reiterated that any suggestive procedures used in the photo identification were irrelevant because Alam had identified Wills later at the preliminary hearing. The district court did not permit Wills to question Detective Feightner about the photo identification or his investigation of the burglary stating that both issues were irrelevant. Wills now argues that he should have been able to examine Detective Feightner about the photo identification because it was relevant to Wills' position that he was not the burglar.

We agree with the district court in its decision that whether Wills was the actual burglar was not the issue in the trial in the district court. The government did not offer the out-of-court photo identification into evidence at the trial, rather it relied upon Alam's identification of Wills at the preliminary hearing to support its theory of motive. Therefore, any suggestive measures employed by Detective Feightner at the earlier photo identification were irrelevant, and the district court did not abuse its discretion in excluding testimony related to the photo identification. The issue was not whether Wills was the burglar, but whether Alam had identified him as such.

B. *Testimony that Alam was not Held*

Wills further asserts that he was denied his right to self-representation when the district court prevented Wills from cross-

19

examining government witnesses as to whether Alam was held prior to leaving for his interview or whether Alam was forced to go to the interview. The district court correctly determined that based upon this court's decision in *Wills I* and the government's theory that Alam was inveigled, the use of force or being held prior to interstate transportation was irrelevant.

### C. *Wills' Affidavit*

Wills further challenges the district court's refusal to allow into evidence a handwritten affidavit signed by Wills on November 30, 1999, which stated that he would not speak to any other prisoners about his case. Wills attempted to offer this affidavit into evidence to corroborate his testimony that he never spoke to James Black during his arraignment. The district court determined that the affidavit was a "preemptive strike" and did not have any probative value. We are of opinion that the district court properly exercised its discretion in refusing to admit the affidavit into evidence.

### D. *Tape Recording*

During its case-in-chief, the government offered a portion of a recorded conversation from May 25, 1998 between Wills and his brother, Michael, of which there was no transcript, in which Wills stated that, "I ain't going back to jail." Wills now claims that this statement is at least partially inaccurate. The judge correctly permitted Wills to play the tape and instructed the jury as follows:

> I've already instructed them that it's their hearing that must be what guides their understanding of the transcript — of the tape. And you can argue that a particular transcript is not accurate. We don't need to hear testimony to that effect.

This was the correct ruling.

### E. *Closing Argument*

Wills made several objections during the government's closing argument regarding the government's characterization of the evi-

20

dence. The district court instructed Wills not to so object and told Wills that he could present his version of the evidence during his own closing argument. Wills now argues that he was denied his right to his defense and to effective self-representation.

We have held that "[t]he district court is afforded broad discretion in controlling closing arguments and is only to be reversed when there is a clear abuse of its discretion. `A reversal may be required where counsel is restricted within unreasonable bounds.'" *United States v. Rhynes*, 196 F.3d 207, 236 (4th Cir. 1999). The district court informed Wills that he would be given the opportunity during his own closing argument to present his own counter arguments to the government's interpretation of the evidence. Thus, the court did not place unreasonable restrictions on Wills by preventing him from objecting during the government's closing arguments and did not abuse its discretion.

### F. *Interview of Witnesses*

Wills further argues that he was denied his right to self-representation because he was unable to interview defense witnesses prior to their testifying at his trial. When Wills raised this argument to the district court, the court responded that because Wills was in custody he had to defend his case within the security arrangements of the United States Marshal and the institution in which he was incarcerated. It properly called to Wills' attention that the reason was that he had chosen to represent himself. We find no error in that decision of the district court.

### V.

Wills raises various challenges to the district court's jury instructions, each of which we will address individually. In reviewing jury instructions, we "accord the district court much discretion and will not reverse provided that the instructions, taken as a whole, adequately state the controlling law." *Teague v. Bakker*, 35 F.3d 978, 985 (4th Cir. 1994).

### A. *Willfully Transported Element of Kidnapping Statute*

Wills argues that the district court incorrectly instructed the jury on the "willfully transported in interstate commerce" element of 18

21

U.S.C. § 1201(a)(1). More specifically, Wills argues that in order for Wills to have transported Alam in interstate commerce, the kidnapping statute requires that Wills "have taken or carried Alam across state lines or have been in actual control or command of Alam's car or Alam's free volition."

In *Wills I*, we held that unaccompanied travel across state lines may satisfy the "willfully transported" element of 18 U.S.C. § 1201(a)(1). The district court instructed the jury that each element of the kidnapping statute must be proven beyond a reasonable doubt and provided the following instruction on the "willfully transported" element:

> To prove that the defendant willfully transported the victim in interstate commerce, the government is not required to prove that the defendant actually accompanied or physically transported or provided for the physical transportation of the victim; in other words, a defendant willfully transports a victim in interstate commerce if the defendant willfully causes the victim to travel or even transport himself unaccompanied across state lines. We are of opinion that this instruction adequately stated the controlling law as interpreted by our decision in *Wills I*.[12]

B. *Unlawful Restraint and Holding Element of Kidnapping Statute*

Wills also asserts that the district court erroneously instructed the jury on the unlawful restraint and holding element of § 1201(a)(1) by failing to instruct the jury that the government had the burden of proving beyond a reasonable doubt that Alam was unlawfully restrained or held prior to being transported over state lines.

As to the unlawful restraint and holding element, the district court instructed the jury as follows:

---

[12] Wills further contends that due to the district court's jury instruction on the willfully transported element of § 1201(a)(1), the court constructively and impermissibly amended the indictment. We hold this claim is without merit.

22

> To hold means to detain, seize, or confine a person in some manner against that person's will.
>
> * * *
>
> The government must prove beyond a reasonable doubt that the defendant held his victim for some benefit and that the defendant willfully transported the victim in interstate commerce. It is not necessary that the government prove that the holding occurred prior to the transportation in interstate commerce. Indeed, in this case, the government has alleged that the transportation in interstate commerce occurred prior to the victim's being held.

We are of opinion that this instruction is consistent with controlling law. The statute has no requirement of prior restraint. "Nothing in the policy [disregard of State borders in pursuit] justifies rewarding the kidnapper simply because he is ingenious enough to conceal his true motive, until he is able to transport . . . [his victim] into another jurisdiction." *United States v. Hughes*, 716 F.2d 234, 239 (4th Cir. 1983). We also hold the instruction did not amend the indictment.

### C.  *Interstate Stalking*

Wills also argues that the district court erred in instructing the jury on the interstate stalking count by failing to instruct that the government must prove that Wills traveled from Washington, D.C., to Fairfax County, Virginia and placed Alam in fear in Virginia as a result of Wills' acts in Virginia. Wills argues that the following instructions allowed the jury to find that Alam was placed in fear as a result of Alam's own travel to Washington, D.C., not as a result of Wills' travel from Washington, D.C., to Fairfax County, Virginia. Wills further argues that the instructions allowed him to be convicted of interstate stalking based on interstate travel outside of the time frame specified in the indictment. The court instructed the jury as follows on the interstate stalking count:

> Count 2 charges that between on or about June 15, 1998, and on or about June 25, 1998, the defendant, Christopher

23

Andaryl Wills, did knowingly travel across a state line, that is, from Washington, D.C., to Fairfax County, Virginia, in the Eastern District of Virginia, with the intent to injure and harass Zabiullah Alam and in the course of and as a result of such travel, place Mr. Alam in reasonable fear of death and serious bodily injury, the actions of Christopher Andaryl Wills resulting in the death of Zabiullah Alam, in violation of Title 18, United States Code, Sections 2261 [A], 2261(b)(1), and Section 2.

\* \* \*

Section 2261[A] of Title 18 of the United States Code provides in pertinent part that whoever travels in interstate commerce with the intent to injure or harass and in the course of or as a result of such travel places that person in reasonable fear of the death of or serious bodily injury to that person shall be guilty of an offense against the United States.

There are three essential elements to the crime of interstate stalking. First, the government must prove beyond a reasonable doubt that the defendant, Christopher Wills, traveled in interstate commerce;

Two, they must prove beyond a reasonable doubt that such interstate travel was with the intent to injure or harass Mr. Alam;

Three, they must prove beyond a reasonable doubt that during or after such travel, the defendant, Christopher Wills, committed an act of placing Mr. Alam in reasonable fear of death or serious bodily injury.

Wills also challenges the supplemental instruction given in response to the following jury question submitted to the court during jury deliberations:

As to Count 2, element 3, we have this question: Did Mr. Alam himself have to experience or be aware of his death

24

or bodily injury? For example, if Mr. Alam was shot without any warning and died instantly, would that preclude a finding of reasonable fear of death or bodily injury?

The district court responded to the jury as follows:

> The question is, "Did Mr. Alam himself have to experience or be aware of the fear of his death or bodily injury?" The answer is yes. The government must prove that beyond a reasonable doubt to satisfy the third element of [the stalking] count.

> Then you asked for an example: "If Mr. Alam was shot without any warning and died instantly, would that preclude a finding of reasonable fear of death or bodily injury?"

> I can't really comment on a hypothetical other than to tell you again that the burden is on the government to prove beyond a reasonable doubt that at some point, the victim - the alleged victim became — was reasonably fearful of death or serious bodily injury. If the evidence is not there to support that, then that element has not been met.

Wills filed a written objection to the instructions on the fear element and then renewed his written objections prior to the original jury instructions. However, Wills failed to object to the supplemental instruction on fear. Thus, we review his objections to the supplemental instruction for plain error. See *United States v. Nicolaou*, 180 F.3d 565, 569 (4th Cir. 1999).

The instructions clearly indicated the period of the alleged travel and twice stated that the defendant, traveled in interstate commerce from Washington, D.C. to Virginia. Furthermore, the jury instruction tracks the language of both the interstate stalking statute and of the indictment.[13] Neither the original jury instruction nor the supplemen-

---

[13] Accordingly, we find Wills' argument that the district court constructively and impermissibly amended the indictment by instructing the jury that it need only find that Wills traveled in interstate commerce, rather than that Wills traveled from Washington, D.C., to Virginia and placed Alam in reasonable fear of death or serious bodily injury without merit.

25

tal instruction suggest that the interstate travel element could be satisfied by the victim's travel or by Wills' travel outside the alleged time period. Thus, we are of opinion that neither the original instruction, nor the supplemental instruction, was error, plain or otherwise. We also decide that the instruction did not amend the indictment.

## D. *Allen Charge*[14]

Wills further contends that the district court coerced the verdict as to the interstate stalking count by giving an *Allen* charge after the jury informed the court that it had reached a decision as to the kidnapping count but was deadlocked as to the fear element of the interstate stalking count. We review the court's decision to provide an *Allen* charge and the content of that charge for an abuse of discretion. See *United States v. Cropp*, 127 F.3d 354, 359-60 (4th Cir. 1997).

We find that the district court properly gave the *Allen* charge after being informed that the jurors had reached an impasse in their deliberations. See *Cropp*, 127 F.3d 359-60. In addition, the charge given properly instructed those jurors in the minority to reconsider the majority's views and those in the majority to reconsider the minority's views. See *United States v. Burgos*, 55 F.3d 933, 937-38 (4th Cir. 1995). The *Allen* charge further instructed the jurors that they should not change their opinions solely to reach an unanimous decision. Thus, the charge did not in anyway request the jurors to surrender their conscientious convictions. See *Burgos*, 55 F.3d at 939 ("The most egregious mistake that can be made in the context of an *Allen* charge is for the district court to suggest, in any way, that jurors surrender their conscientious convictions."). Accordingly, the district court did not err in giving an *Allen* charge or in the content of the charge.

## E. *Aiding & Abetting Instruction*

Wills argues that the district court erroneously instructed the jury under 18 U.S.C. § 2(a) (aiding and abetting) although it was not charged in the indictment. He argues that the court's instructions con-

---

[14] *Allen v. United States*, 164 U.S. 492 (1896).

26

structively amended the indictment because the government's theory of the case rested on the causation language of 18 U.S.C. § 2(b) and not under the aiding and abetting language of § 2(a).[15]

Both the kidnapping and the interstate stalking counts of the indictment expressly charged a violation of 18 U.S.C. § 2, and neither indicated a specific subsection of that statute. Therefore, we are of opinion that the district court's instruction under § 2(a) (aiding and abetting) did not amount to a constructive amendment of the indictment. In all events, a conviction under 18 U.S.C. § 2 may be obtained although the defendant was not indicted under § 2. *United States v. Duke*, 409 F.2d 670 (4th Cir. 1969).

## VI.

Wills next contends that the evidence was insufficient to convict him of interstate kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1). In reviewing a conviction for sufficiency of the evidence, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942). To establish a violation of 18 U.S.C. § 1201(a)(1), the government must show, beyond a reasonable doubt that, the defendant (1) unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away the victim; (2) held the victim for ransom, reward, or otherwise; and (3) willfully transported the victim in interstate commerce. See *Wills I*, 234 F.3d 174, 176-77 (4th Cir. 2000).

Wills asserts that the evidence was insufficient to prove that he kidnapped Alam or that the kidnapping resulted in Alam's death. Wills

---

[15] 18 U.S.C. § 2 provides:

> (a)  Whoever commits an offense against the United States or aids, abets, commands, induces or procures its commission, is punishable as a principal.

> (b)  Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2 (2000).

27

argues that, at most, the evidence was only sufficient to convict him of conspiracy to kidnap. Giving the job fliers to Alam, arranging the job interview, and arranging the false cell phone number and the phone calls to Alam are certainly evidence of decoying and inveiglement. Wills' expressed intent to eliminate Alam as a witness to Wills' burglary is evidence of the reason for Alam's kidnapping. Alam's travel from Fairfax County to the District of Columbia is a sufficient jurisdictional connection. Alam left his job unpaid, he made no travel plans, he was about to become a United States citizen, his identification of Wills as a burglar, and Wills' conversations with his brother and Black all are evidence to support the finding of the jury that Alam died as a result of being kidnapped.

The government presented evidence that Wills inveigled and decoyed Alam into meeting him for a job interview by leaving fliers at Alam's home on June 18, 1998 and June 19, 1998. Wills discussed his plan with his brother shortly after the preliminary hearing, stating that he would have to use "some trickery." On June 18, the same day that the first flier was left at Alam's house, Wills informed his brother that he had put "Plan A" into action. Then on June 19, Wills alluded to the fliers in telephone conversations with his brother stating, "I already got the fliers out and everything, so I'm just waiting, you know, for them to get it and call, and, I ain't got no calls yet, man."

The government also presented evidence that the phone number listed on the fliers contained a number which was directly linked to Wills. Reginald Johnson, a sales representative at Radio Shack, identified Wills as the man who had purchased pre-paid cellular service for a pre-existing cell phone using the name "Ed Short" on or about June 17, 1998. Johnson also testified that on or about June 18, 1998, Wills returned to the Radio Shack complaining that the cell phone did not function properly. Johnson's testimony is consistent with Wills' June 19, 1998 conversation with his brother, during which Wills indicated that he had been at Radio Shack and that his cell phone had not been functioning properly. Also, on or about June 19, a handwritten note dated "6/19/98" and listing the same telephone number was left at Alam's apartment which read, "Were [sic] sorry that our phones were down yesterday 6/18/98 *Please!* Try our line again. Were [sic] open 7 days a week. Jobs!!" Neal Carver, Cingular Wireless' Asset Protection Manager, testified that Cellular One's records indicated

28

that on June 22, 1998 the cell phone number given to Ed Short was transferred to a phone previously used by Christopher Wills.

The government also presented evidence that Wills and Alam had been speaking via telephone. Cellular One records revealed that calls were placed from the phone number linked to Wills to Alam's home phone number on June 23 and June 24, and to Alam's pager three times on June 25. In addition, Alam's cousin and his friend, Ali Muradi, testified that a man named Felliece had called Alam regarding the grounds keeping job and gave the number advertised on the fliers as his own. Muradi further testified that Alam was scheduled to meet Felliece's secretary at Union Station. The government presented evidence that Felliece was also the name of a man who called the Augusta Correctional Center on two occasions claiming to be an attorney for Michael Wills and that this man gave Christopher Wills' address and telephone number as his own. Thus, we are of opinion that the government presented sufficient evidence for a jury to conclude that Wills inveigled Alam into traveling from Virginia to Washington, D.C.

Wills further contends that the government presented insufficient evidence for the jury to conclude that Wills held and killed Alam. At oral argument, the defense argued that there was a lack of evidence showing that Alam was held for an appreciable period. See *Chatwin v. United States*, 326 U.S. 455, 460 (1946). No instruction was requested or given on appreciable time nor did the defense file a motion for acquittal based on appreciable time. Thus, this claim might well be defaulted. However, there is sufficient evidence in the case to show that an appreciable period elapsed between the time when Alam was decoyed and inveigled and the point at which Alam was determined to be missing.

Wills argues that the government failed to present any direct evidence of Alam's death or that Wills murdered Alam. However, the government did present direct evidence in the form of James Black's testimony that Wills told him, "they'll never find the body," and Alonzo Nichols' testimony that he overheard Wills telling Black, "They can't give me the death penalty because they ain't never going to find the body." See *United States v. Russell*, 971 F.2d 1098, 1110

29

n.24 (4th Cir. 1992) ("Confessions and eyewitness or ear-witness testimony, of course, are forms of direct evidence . . . .").

Nevertheless, we have held that when a victim's body has not been found the corpus delicti may be established exclusively by circumstantial evidence. See *Russell*, 971 F.2d at 1110 n.24. The government presented evidence that Wills told his brother, "I'm trying to get this dude, man. If I don't my ass is grass." Furthermore, the government presented evidence that although Alam's car was found in a Maryland apartment complex parking lot on June 28, 1998, Alam has not been seen since June 25, 1998, when he was given a citation for not wearing his seatbelt. Prior to leaving his Virginia apartment on June 25, Alam had told his family and friends that he was going to meet Mr. Felliece's secretary at Union Station for a job interview for the grounds keeping position advertised in the fliers.

Wills argues that the government's evidence is insufficient because it fails to show that Wills, or someone acting on his behalf, ever met with Alam. Wills also contends that the evidence does not indicate that Alam ever went to Union Station. However, the government presented evidence that the day after Alam was last seen, Wills spoke to his brother via telephone and answered in the affirmative when his brother asked, "You handle the business?" and "Everything taken care of?" Wills also told his brother, "I was doing a Casino joint," referring to the movie, CASINO, in which a portion of the movie dealt with the elimination of potential witnesses. Wills later told his brother that he "handle[d] his business" and that his "people" were "on the scene, but they don't know disposal."

Wills further contends that Alam may have voluntarily vanished and may not wish to contact his family or friends. The government, however, presented testimony that Alam gave no indication that he did not intend to return home. Alam did not take any personal items with him and he took very little cash. He had no credit cards, no passport, and no travel documents. Furthermore, he never returned to his job at the Fish Market, nor did he pick up his paycheck. Finally, the police checked local morgues, other police agencies and police computer files, and entered Alam's name into the national crime database in an effort to locate him but these efforts were unsuccessful. After viewing this evidence in the light most favorable to the government,

30

we are of opinion there was sufficient and substantial evidence for a jury to conclude that Wills held and murdered Alam.

We therefore are of opinion that the government presented substantial and sufficient evidence for the jury to convict Wills of kidnapping in violation of 18 U.S.C. § 1201(a)(1).

## VII.

Wills also claims that the government presented insufficient evidence to convict him of interstate stalking resulting in death in violation of 18 U.S.C. § 2261A.

Again, in reviewing a conviction for the sufficiency of evidence "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942). To establish a violation of 18 U.S.C. § 2261A, the government must show, beyond a reasonable doubt, that the defendant (1) traveled across State lines; (2) with the intent to injure or harass another person; and (3) in the course of, or as a result of, such travel, placed that person in reasonable fear of death or of serious bodily injury. See 18 U.S.C. § 2261A. Because we have already held that the government presented sufficient evidence from which a jury could conclude that Wills killed Alam, we need not address that issue again, except to say that there is substantial evidence to support the verdict of the jury that Alam died as a result of being stalked.

Wills argues that the government failed to establish the interstate travel requirement of § 2261A because, he contends, it presented evidence that Alam, not Wills, traveled across state lines. However, the government presented evidence that the interstate stalking began on June 15, 1998 when Wills traveled from Washington, D.C., to Fairfax County, Virginia, for the preliminary hearing in Fairfax County General District Court in which Alam identified Wills as the man whom he had discovered burglarizing his home. Wills later told his brother that his "peoples" were with him "undercover" at the preliminary hearing to watch Alam and to find out what type of car Alam drove. The government also presented evidence that Wills traveled to Alam's apartment to leave fliers on June 17, 1998 and June 18, 1998,

31

which is consistent with Wills' statements to his brother, "I already got the fliers out and everything . . ." and that he had put "Plan A" into action. Thus, we are of opinion that there was sufficient evidence for the jury to conclude that Wills traveled from his home in Washington, D.C., to Virginia.

Next we must determine whether the government presented sufficient evidence from which a jury could find that Wills intended to injure or harass Alam.[16] After the preliminary hearing, Wills described to his brother how Alam had identified him at the hearing and stated, "I ain't got time to leave it at that." The government also presented other statements made by Wills to his brother, including the statement, "I'm trying to get this dude, man. If I don't my ass is grass." In addition, after the fliers were left at Alam's apartment, Wills told his brother, "I already got the fliers out and everything, so I'm just waiting, you know for them to get it and call. . . I'm trying to, you know, figure out how to go at him." Wills "Doing a Casino" also at the very least inferred harm to Alam. After viewing this evidence in the light most favorable to the government, we find that there was substantial and sufficient evidence from which the jury could have concluded that Wills intended to harm or harass Alam.

Wills contends that "[t]he record is completely devoid of any evidence that Alam was placed in fear of death or serious bodily injury." In response, the government argues that when viewed as a whole, Wills' statements to his brother on June 26 and 27, particularly the references to CASINO, and Wills' trial testimony, was sufficient evidence from which a jury could reasonably have concluded that Alam experienced fear prior to his death.

The government presented evidence that Alam was to meet Felliece's secretary at Union Station and that Felliece was a name which had been used by Christopher Wills in the past. The government argues that the jury could have reasonably concluded that after Alam met Felliece's secretary, Alam was taken by an accomplice to another location. The government contends that this theory is supported by statements Wills made to his brother, after Alam was missing: "I ain't

---

[16] On appeal, Wills has not raised a specific challenge to the sufficiency of the evidence supporting his intent to injure or harass Alam.

32

had to show my face at all, period" and his "people" were "on the scene, but they don't know disposal." Wills also told his brother, "I'm gonna tell you some things . . . But you know I can't say it on the phone, `cause it pertains to something, you know." Wills then referred to the movie, CASINO, saying, "I was doing a *Casino* joint, right?" In the final part of CASINO, which the government played in court, two mobsters are beaten, stripped of their clothing, and buried alive in shallow graves in a remote cornfield. The government argues that it was reasonable for the jury to conclude that Wills had killed Alam in a similar manner and could have inferred that the phrase "sweating ass naked" was a description of Alam, in fear, prior to his death. The government further argues that it was reasonable for a jury to conclude from its observations of Wills' demeanor on the stand while he testified and from hearing his recorded conversations that Wills had placed Alam in fear of death or of serious bodily injury. We agree with the government and conclude that the government presented substantial and sufficient evidence from which a jury could infer that Wills had placed Alam in fear of death or of serious bodily injury.[17]

## VIII.

Wills raises three additional issues relating to the element of death as it relates to kidnapping and interstate stalking.

Wills first contends that the indictment was fatally defective because it failed to allege the time and place of Alam's death as well as the fatal blow that caused his death. In support of his claim, Wills relies on the common law year and a day rule, which requires that the

---

[17] Wills also argues that the government failed to establish venue in the Eastern District of Virginia for the interstate stalking count because it did not present any evidence that Alam was placed in fear while he was in Fairfax County, Virginia on any of the days that Wills was alleged to have traveled to Virginia. Wills argues that stalking does not begin until a person is placed in fear of death or of serious bodily injury. Therefore, he argues that venue in the Eastern District of Virginia was inappropriate because Alam was not placed in fear until he traveled to Washington, D.C. We disagree. We are of opinion that venue was proper in both the Eastern District of Virginia, where Wills left fliers at Alam's apartment, and in the District of District of Columbia.

33

victim's death occur within a year and a day of the alleged fatal stroke, blow, or injury perpetrated by the defendant. See *United States v. Chase*, 18 F.3d 1166, 1169 (4th Cir. 1993).

Both counts of the indictment allege that the kidnapping and stalking offenses, including Alam's resulting death, occurred between June 15, 1998 and June 25, 1998. Thus, we conclude that the indictment was sufficient to provide Wills with fair notice of his alleged criminal conduct and that it complied with the year and a day rule.

Second, Wills asserts the court's instructions and findings at sentencing as well as the government's arguments and presentment of evidence constructively amended the indictment to charge Wills with the premeditated, intentional, capital murder of Alam. Wills claims that the indictment did not charge premeditated, intentional, or capital murder of Alam because it did not allege how Alam died nor did it allege a fatal stroke perpetrated by Wills.

We conclude that the jury instructions and the government's evidence did not impermissibly broaden the bases for conviction beyond those charged in the indictment. See *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999). The indictment explicitly charged Wills with the kidnapping and interstate stalking of Alam which resulted in Alam's death. The evidence presented by the government was relevant to the elements of the charged offenses. Furthermore, as to both counts of the indictment the court instructed the jury that it "must determine whether Zabiullah Alam is dead . . . and if so, whether his death resulted from the willful and intentional conduct of the defendant." We are of opinion that these instructions did not constructively amend the indictment. Therefore, we find that Wills' argument lacks merit.

Finally, Wills argues that the district court erroneously instructed the jury that Alam's death could be proven by circumstantial evidence. In reviewing the adequacy of the instructions, we "accord the district court much discretion and will not reverse provided that the instructions, taken as a whole, adequately state the controlling law." *Teague v. Bakker*, 35 F.3d 978, 985 (4th Cir. 1994).

As we have already stated, we have held that when a victim's body has not been found "it is well settled that the corpus delicti in general,

34

and the victim's death, in particular, may be established exclusively by circumstantial evidence." *United States v. Russell*, 971 F.2d 1098, 1110 & 1110 n.24 (4th Cir. 1992). Hence, the district court's instruction stated the controlling law in this circuit and the court did not err.

## IX.

### A.

The government having given the notice under 18 U.S.C. § 3593 that it would seek the death penalty on the kidnapping charge, the case was submitted to the jury on special verdict of two parts. To the question "Has the government proven beyond a reasonable doubt that . . . Wills kidnapped Zabiullah Alam?" the jury answered "Yes." To the second question "Has the government proven beyond a reasonable doubt that Zabiullah Alam died as a result of being kidnapped?" the jury answered "Yes."

On a day following, the court conducted a special sentencing hearing with the same judge and the same jury, pursuant to 18 U.S.C. § 3593. The sentencing hearing also was submitted to the jury by way of special verdict, obviously prepared with care, in which the jury answered 25 questions with respect to both aggravating and mitigating factors and recommended that Wills be sentenced to life imprisonment without the possibility of release.

The only objection made to the sentencing on the kidnapping count is that the court erred in applying a cross reference in the Sentencing Guidelines of § 2A1.1 for first-degree murder and a base offense level of 43. Coupled with that, the claim is that the indictment is defective for failing to elect any facts or factors establishing the element of Alam's murder or death.

The Guideline for kidnapping, however, is § 2A4.1 which, in subsection (c) provides if the victim was killed under circumstances that would constitute murder under § 1111, then the first-degree murder Guideline should be applied. The special verdict form on the merits provided that Alam "died as a result of being kidnapped," and the special verdict on punishment provided that "WILLS intentionally partic-

35

ipated in an act of kidnapping, contemplating that the life of Zabiullah Alam would be taken and/or intending that lethal force would be used in connection with the kidnapping." Another statutory aggravating factor found was that "WILLS committed the kidnapping offense after substantial planning and premeditation to cause the death of Zabiullah Alam." These facts certainly justify the reference to § 2A1.1, the first-degree murder Guideline.

The claim that the various aggravating factors had to be alleged in the indictment is not required by *Ring v. Arizona*, 536 U.S. 584 (2002) which does require, however, that they be submitted to the jury, as they were in this case. The district court correctly followed the applicable statutes and Sentencing Guidelines.

In all events, the government correctly claims that a life sentence was required by the statute, without reference to the Sentencing Guidelines, because the jury did not recommend the death sentence. Section 1201(a)(5) in such a case requires punishment to be "by death or life imprisonment."

## B.

The stalking conviction was also submitted to the jury by way of special verdict on the merits and was returned that the government had "proven beyond a reasonable doubt that . . . Wills, stalked Zabiullah Alam" and that the government had "proven beyond a reasonable doubt that Zabiullah Alam died as a result of being stalked." The parties are agreed that the offense level under the Sentencing Guidelines for stalking was 43.

One of the jury's answers on the special verdict form as to kidnapping was that Wills intentionally participated in the act of kidnapping, and the district court found "The facts of this case established the premeditated, deliberate, and malicious planning of kidnapping and killing of the victim." Thus, the district court was well within its discretion in sentencing Wills to life imprisonment under § 2261(b)(1) which provides for a sentence of "life or any term of years, if death of the victim results." So far as sentencing for stalking may be considered to be an amendment to the indictment, it is likewise without merit.

36

The judgment of the district court is accordingly

*AFFIRMED*.[18]

_____

[18] Any claims of error we may have not mentioned with particularity have been considered and are likewise without merit.